Paul BERGERON, Individually and on behalf of the P. Bergeron Nominee Trust

v.

RIDGEWOOD SECURITIES CORP., et al.

Civil Action No. 06–10321 RGS.

United States District Court, D. Massachusetts.

March 31, 2009.

William C. Nystrom, Robert S. Messinger, Nystrom Beckman & Paris LLP, Boston, MA, for Paul Bergeron.

Robert B. Luce, Downs, Rachlin & Martin PLLC, Walter E. Judge, Jr., Downs, Rachlin & Martin, Burlington, VT, Steven L. Manchel, Manchel & Brennan, LLP, Needham, MA, for Ridgewood Securities Corp., et al.

### MEMORANDUM AND ORDER ON THE REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

STEARNS, District Judge.

After careful consideration of defendants' eight vigorously articulated Objections to Magistrate Judge Dein's Report and Recommendation, I will *ADOPT* her Report and Recommendations with one small caveat. A few comments are in order. Although one might think otherwise from a reading of the thirty-five pages of the Objections, the Report is nuanced, objective, and balanced. The Magistrate Judge recommends the allowance of defendants' motion for summary judgment on a number of plaintiff's claims, including the claims of breach of fiduciary duty (usurpation of corporate opportunities), and all breach of contract claims other than those related to the (allegedly) promised IPO. Where differences exist between defendants and the Magistrate Judge, they focus principally on two issues: (1) defendants' objection to evidence that the Magistrate Judge credited that they find unbelievable, uncorroborated, or unreliable, *see, e.g.,* Objections, at 11–12; and (2) her refusal to treat certain claims of reliance on the part of plaintiff as unreasonable as a matter of law, *see, e.g., id.* at 16. With respect to the first issue, defendants make strong arguments about the quality and force of much of the evidence, but do not give sufficient recognition to the Magistrate Judge's scrupulous deference to a summary judgment standard that requires her to give plaintiff, as the non-moving party, the benefit of every contested (and uncontested) factual inference. *See Oliver v. Digital Equip. Corp.,* 846 F.2d 103, 105 (1 st Cir.1988). As to the second area, the issue is not that the Magistrate Judge did not recognize that in very limited circumstances reliance can be unreasonable as a matter of law, *see* Report, at 57–58[1]; rather she found that the facts—again viewed in the light most favorable to plaintiff—take this case out of the exception and commit it to a resolution by the jury.[2] Finally, the suggestion that the

---

1. As a general matter, I cannot find a legal issue raised by defendants that is not anticipated and discussed in the Magistrate Judge's Report.

2. For essentially the same reason, the Magis-

Magistrate Judge failed to recognize the evidentiary consequences of the various integration agreements is simply not borne out by the Report, *see, e.g., id.* at 44.[3]

## ORDER

For the reasons stated by the Magistrate Judge in her Report, defendants' Motion for Summary Judgment is *DENIED* as to Counts I, V, VI, and VII[4]; *ALLOWED* as to Count II; and *ALLOWED* in part and *DENIED* in part as to Counts III and IV. The Clerk will assign a date for trial of the remaining claims. Counsel will, within ten (10) days of the date of this Order, submit a joint estimate of the number of days anticipated for trial of the case, consistent with a daily jury sitting of 9:00 a.m. to 1:00 p.m.

SO ORDERED.

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DEIN, United States Magistrate Judge.

### I. INTRODUCTION

The plaintiff, Paul Bergeron ("Bergeron"), has brought this action on behalf of himself and the P. Bergeron Nominee Trust against Ridgewood Securities Corp., its affiliated entities and three of its officers (collectively, the "Defendants" or "Ridgewood"), claiming that the Defendants made material misrepresentations and omissions in order to induce Bergeron to invest in five separate private equity funds created and marketed by the Defendants, and that they breached certain contractual obligations and fiduciary duties owed to investors of their funds. The individual Defendants include Robert E. Swanson, the ultimate owner of the Ridgewood companies, Robert L. Gold, an officer of Defendant Ridgewood Capital Management, LLC, and Randall D. Holmes, an officer of Defendant Ridgewood Renewable Power LLC. By his Second Amended Complaint, Bergeron has asserted claims against the Defendants for violation of the Massachusetts Uniform Securities Act, Mass. Gen. Laws ch. 110A, § 410 (Count I), breach of fiduciary duty (Count II), breach of contract (Count III), breach of the implied covenant of good faith and fair dealing (Count IV), fraud and deceit (Count V), negligent misrepresentation (Count VI) and unfair and deceptive trade practices under Mass. Gen. Laws ch. 93A (Count VII).

The investments giving rise to this litigation were made in two general categories of Ridgewood funds. The first catego-

---

trate Judge found that most of the dispute over the application of the various statutes of limitations also gives rise to a jury issue. This finding was manifestly correct. *See Wolinetz v. Berkshire Life Ins. Co.,* 361 F.3d 44, 48 (1st Cir.2004).

3. To the extent I understand defendants to object to certain discovery rulings of the Magistrate Judge and various aspects of her Case Management Order, I note that these objections were waived by defendants' failure to lodge them in a timely manner with the district court. See Rule 2(b), Rules for U.S. Magistrate Judges in the U.S. District Court for the District of Massachusetts.

4. Mindful of the fact that the claim under Mass. Gen. Laws ch. 93A will be tried to the court and not the jury, I will reserve judgment for trial on one aspect of defendants' Sixth Objection: the issue of whether the disputed transaction, because of its allegedly private nature, lies beyond the reach of the statute. "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact ... the boundaries of what may qualify for consideration as a G.L. c. 93A violation is a question of law." *R.W. Granger & Sons v. J & S Insulation, Inc.,* 435 Mass. 66, 73, 754 N.E.2d 668 (2001).

ry of funds, known as the "Power Funds," offered accredited investors an opportunity to invest in the independent power and renewable energy sector. Bergeron initially invested in Ridgewood's Power Trust V Fund on January 23, 1998, and on December 31, 1998, he invested in Ridgewood's Power Growth Fund. The second category of funds, known as the "Venture Funds," consisted of a series of venture capital funds that invested in private technology companies. Bergeron purchased shares in three of Ridgewood's Venture Funds during the time period between April 26, 1999 and January 7, 2002.

Bergeron claims that the Defendants fraudulently induced him to invest in these funds by representing that Ridgewood was planning a $500 million initial public offering ("IPO") of its power generating assets when they knew that there were no concrete plans for achieving an IPO and that no feasibility analysis had ever been conducted, and by falsely promising Bergeron a guaranteed 4% return on his investment leading up to the IPO. He further claims that the Defendants breached their fiduciary and/or contractual obligations under the Venture Fund offering documents by investing in early stage companies, and by shifting investment opportunities away from existing funds and into newly created funds. Bergeron asserts that he has lost $900,000 as a result of the Defendants' conduct.

The Defendants deny Bergeron's claims, and contend that the plaintiff was a sophisticated investor who deliberately sought out and invested in high risk products in the hopes of achieving high returns. They assert that Bergeron's financial loss is unrelated to any misconduct on their part, but instead is attributable to significant adverse developments in the independent power business, and to the crash of the high-tech and dot.com markets, which decimated the companies acquired through the Ridgewood funds.

This matter is presently before the court on the "Defendants' Motion for Summary Judgment" (Docket No. 79) by which the Defendants are seeking summary judgment on all of Bergeron's claims. For all the reasons detailed below, this court recommends to the District Judge to whom this case is assigned that the motion for summary judgment be ALLOWED IN PART and DENIED IN PART. Specifically, this court recommends that the motion be DENIED as to Count I; ALLOWED as to Count II; DENIED as to the claims relating to the IPO in Counts III and IV, but otherwise ALLOWED as to Counts III and IV; and DENIED as to Counts V, VI and VII of the Second Amended Complaint.

## II. STATEMENT OF FACTS[5]

The following facts are undisputed unless otherwise indicated.[6]

---

5. The facts are derived from the following materials: (1) the Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment (Docket No. 80) ("DF ¶___"); (2) the Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts (Docket No. 96) ("PR ¶___"); (3) Bergeron's Statement of Material Facts in Dispute (Docket No. 97) ("PF ¶___"); (4) the exhibits to Defendants' Statement of Undisputed Material Facts (Docket No. 92) ("Def.Ex.___"); (5) the exhibits attached to the Declaration of Robert S. Messinger, Esq. (Docket No. 101) ("Pl.Ex.___"); (6) the Affidavit of William C. Nystrom, Esq. (Docket No. 99) ("Nystrom Aff. ¶___"); and (7) the Affidavit of Paul Bergeron (Docket No. 98) ("Bergeron Aff. ¶___"), except for paragraph numbers 23–25, which have been stricken pursuant to this court's Memorandum of Decision and Order on Defendants' Motion to Strike issued on this date.

6. In connection with the pending motion, the parties have filed Local Rule 56.1 statements

### The Parties

Plaintiff Paul Bergeron is an individual who resides in Wellesley, Massachusetts. (2d Am.Compl. ("Compl.") (Docket No. 78) ¶ 1). He is the trustee and beneficiary of the P. Bergeron Nominee Trust. (*Id.*). Bergeron holds a college degree in economics, and has served as the President of several companies, including Wang Canada, Interbace Software and Charter Systems. (DF ¶ 10, PR ¶ 10). Prior to his introduction to Ridgewood, Bergeron had substantial experience as an investor, and had managed his own buying and selling of stock. (DF ¶¶ 14, 19). In particular, Bergeron had previously invested in both high-tech stocks and non-stock market products. (*Id.* ¶ 14).

The Ridgewood family of companies has been offering private equity investment opportunities to high net worth individuals since 1982. (DF ¶ 1). It consists of three core business programs, including oil and gas investments, renewable electric power investments and venture capital investments. (*Id.*). Defendant Ridgewood Renewable Power LLC ("Ridgewood Power"), the successor in interest to defendant Ridgewood Power Corporation, manages business trusts that own and operate renewable electric power and infrastructure projects. (DF ¶ 2). It has raised over $350 million, which has been invested in projects located in various states and overseas. (*Id.*). Between 1997 and 2001, Ridgewood Power organized and managed a series of private equity Power Funds that offered accredited investors an opportunity to invest directly in businesses operating in the independent power and renewable power sectors. (PF ¶ 2; DF ¶ 4).

Certain of Bergeron's claims in this case arise out of his investments in two of those Funds, including the Ridgewood Electric Power Trust V ("Power Trust V") and the Ridgewood Power Growth Fund ("Power Growth Fund").

Defendant Ridgewood Capital Management, LLC ("Ridgewood Capital") manages private equity venture capital funds that invest in a diverse portfolio of private technology companies. (DF ¶ 3). Between 1997 and 2001, Ridgewood Capital managed the Ridgewood Capital Venture Partners LLC Funds I, I–B and II. (*Id.* ¶ 4). Bergeron has asserted contractual and fiduciary claims arising from his investments in each of these Venture Funds. During the relevant time period, defendant Ridgewood Securities Corporation served as the placement agent for the Power and Venture Funds. (*Id.* ¶ 6; PR ¶ 6).

Defendant Robert E. Swanson ("Swanson") was responsible for the formation of Ridgewood Power, and is the ultimate owner of the Ridgewood companies. (PF ¶¶ 1, 13). Each of the individual Defendants, including Swanson, Robert L. Gold ("Gold") and Randall D. Holmes ("Holmes"), serves as an officer of either Ridgewood Power or Ridgewood Capital. (DF ¶ 5).

### Bergeron's Receipt of the Power Fund Offering Memorandum

In late 1997, Bergeron was introduced to Paul Hess, a financial advisor with Commonwealth Equity Services, Inc. in Boston, Massachusetts, who was authorized to sell Ridgewood securities. (DF ¶ 12; PF ¶ 10). At the time, Bergeron was in his

consisting of several hundred paragraphs of asserted facts. It is impossible to include all of these facts in this Report and Recommendation, and some level of generalization has been necessary. Nevertheless, the Statement of Facts set forth herein reflects this court's careful scrutiny of the parties' factual statements and responses thereto, as well as the underlying record, and this court's effort to provide a fair description of the material facts that are relevant to the present motion for summary judgment.

mid-fifties and had recently retired. (DF ¶ 12). Mr. Hess considered the plaintiff to be one of his most sophisticated clients. (*Id.* ¶ 20).

Bergeron told Mr. Hess that he was looking for high return investments, and he characterized himself as an aggressive investor. (DF ¶¶ 17–18; PR ¶¶ 17–18). Mr. Hess recommended that Bergeron purchase an interest in Power Trust V, which he described as a "top-quality income program." (PF ¶ 11). Shares of Ridgewood funds were offered only to "qualified" or "accredited" investors having a high net worth. (DF ¶ 7; PR ¶ 7). Bergeron certified to Mr. Hess that he was an accredited investor with an annual gross income of over $300,000, significant investments and holdings, and a net worth of nearly $6 million. (DF ¶ 21).

Before Bergeron committed to making any investments in any of the Power Funds, Mr. Hess gave the plaintiff a Ridgewood Power Offering Memorandum that described, among other things, the nature of the investments and the potential risks of investing in the Power Funds. (DF ¶ 30; PR ¶ 30; Def. Ex. B). In particular, the Offering Memorandum described the objectives of the Power Funds as follows:

> The business plan of the Trust is to build a portfolio of investments in (a) non-utility generating facilities which sell electrical, motive and/or thermal power, (b) other non-utility facilities which provide power-related products or services, (c) other facilities that provide products or services for the energy or environmental industries and (d) capital facilities that have similar investment and cash flow prospects. These facilities are referred to as "Projects."

> \* \* \*

> The investment objectives of the Trust are to (a) generate current cash flow for distribution to Investors from the operation of the Projects and (b) provide capital appreciation over an extended period either through the sale of all or a portion of the Projects or through the creation of a more liquid investment. This might be achieved by combining the Trust with other entities, by a public offering by the Trust, by creating a market for the Investor Shares or by a combination of these shares. There is no assurance that the Trust will be able to meet those investment objectives.

(Def. Ex. B at RW000010). Thus, in the absence of a liquidity event, the purpose of investing in the Power Funds would be to receive periodic checks from the sale of electricity. (PF ¶ 3).

With respect to potential risks, the Offering Memorandum contained numerous warnings to investors. For example, but without limitation, the Offering Memorandum provided:

> THIS INVESTMENT IS SPECULATIVE AND NON–LIQUID AND INVOLVES A HIGH DEGREE OF RISK, including severe restrictions on transferability of the Shares.

> \* \* \*

> Because of the Managing Shareholder's success in offering four prior power trust programs, the Trust should be able to explore the possibility of creating a public market at some future date after its business is well established, either by combining the Trust or its assets with other programs sponsored by the Managing Shareholder so as to create an entity with marketable securities or by organizational changes necessary to allow public trading ... There may be significant legal, tax and business impediments to these alternatives and no Investor should rely upon the possible

future availability of a public market for the Investor Shares. . . .

As with most equity investments, there are many risks to the Investor. Among those that especially apply to the Trust are the illiquidity of the Investor Shares, possible insufficient diversification in Projects, possible inability to operate Projects profitably, changes in regulatory and environmental protection requirements, attempts by utilities to terminate power supply contracts that are favorable to the Trust, illiquidity of the Trust's assets and conflicts of interest. There are many other significant risks.

(Def. Ex. B at RW000001, RW000005) (emphasis in original).

The Offering Memorandum further provided that potential investors could ask questions and seek additional information from Ridgewood, but it warned investors not to rely on such information unless it was put in writing and signed by Ridgewood. Specifically, the document read in relevant part:

THE PURPOSE OF THIS MEMORANDUM IS TO PROVIDE A PROSPECTIVE INVESTOR WITH THAT INFORMATION WHICH THE TRUST BELIEVES IS PERTINENT IN MAKING AN INFORMED INVESTMENT DECISION AS TO PARTICIPATION IN THE TRUST. IT IS RECOGNIZED THAT ADDITIONAL INFORMATION MAY BE DESIRED BY A PROSPECTIVE INVESTOR PRIOR TO MAKING HIS INVESTMENT DECISION. THEREFORE, EACH PROSPECTIVE PURCHASER MAY ASK QUESTIONS OF THE TRUST AND RECEIVE ANSWERS CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING AND MAY OBTAIN ANY ADDITIONAL INFORMATION WHICH THE TRUST POSSESSES OR CAN AC-

QUIRE WITHOUT UNREASONABLE EFFORT OR EXPENSE THAT IS NECESSARY TO VERIFY THE ACCURACY OF INFORMATION CONTAINED IN THIS MEMORANDUM. REQUESTS FOR FURTHER INFORMATION SHOULD BE MADE TO THE TRUST AND *SUCH INFORMATION SHOULD BE RELIED UPON ONLY WHEN FURNISHED IN WRITTEN FORM AND SIGNED ON BEHALF OF THE TRUST.*

(Def. Ex. B at RW000007) (additional emphasis added).

Bergeron read the Offering Memorandum and signed a certification confirming his receipt of the document. (DF ¶¶ 32–33; PR ¶ 32). By signing the certification, the plaintiff agreed, among other things, that "I cannot rely on any other representations than those appearing in the [Offering Memorandum]." (DF ¶ 32; PR ¶ 32; Def. Ex. F at 115–16). He also acknowledged that he had read the disclosures in the Offering Memorandum about risks and considered the investment suitable. (*Id.*).

In January 1998, prior to making his initial investment in the Power Funds, Bergeron spoke to Swanson by telephone. (PF ¶ 13; Pl.Ex. E at 57–58). The parties dispute the substance of the statements that Swanson made to Bergeron during the course of the call. (*See* DF ¶ 47). When the evidence is viewed in Bergeron's favor, it shows that during the call, Bergeron asked several questions concerning the risk and nature of the investment, as well as questions about Ridgewood's plan for a Power Fund IPO. (Bergeron Aff. ¶ 4). Swanson told Bergeron that the investment was low risk because it involved utilities rather than the stock market. (*Id.*). Furthermore, Swanson said that Ridgewood would have a Power IPO in two or three years, and he further assured the plaintiff that he would receive annual in-

terest payments of 4% leading up to the IPO. (*Id.*; PF ¶ 15). According to Bergeron, Swanson summed up the call by asking, "where else could you get guaranteed 4% interest?" (PF ¶ 15; *see also* Pl.Ex. E at 58; Bergeron Aff. ¶ 4).[7]

It is undisputed that none of the written offering documents made any mention of guaranteed interest payments or otherwise indicated that Ridgewood was obligated to make periodic payments to shareholders of the Power Funds other than distributions out of any cash flow generated by the operations of the power projects. Nevertheless, Bergeron claims that he relied upon Swanson's representations regarding guaranteed payments of 4% and plans for an IPO in deciding to invest with Ridgewood.[8] (PF ¶¶ 16–17).

### Bergeron's Investment in the Power Trust V Fund

On January 23, 1998, Bergeron invested $100,000 in Ridgewood's Power Trust V Fund. (DF ¶ 24). In connection with his investment, Bergeron signed a Subscription Agreement by which he agreed, among other things, to purchase shares in the Fund and by which he made certain representations and warranties. (DF ¶ 36; PR ¶ 36; Def. Ex. V. at RW000727–29). Significantly, the plaintiff represented and warranted that he had read the Offering Memorandum and that he was "**not** relying on any oral statement made to [him] or written material supplied to [him] and not otherwise contained in the [Offering] Memorandum in deciding to purchase Shares subscribed for herein." (DF ¶ 39; PR ¶ 39; Def. Ex. V at RW000727–28). Pursuant to the Subscription Agreement, Bergeron also acknowledged that "I have been advised that the shares involve a high degree of risk and that there are no assurances that I will recover my investment or receive any return at any time." (DF ¶ 41; PR ¶ 41; Def. Ex. V at RW000729).

On February 11, 1998, Ridgewood sent a welcome letter to all of the shareholders of the Ridgewood Power Trust V, including Bergeron. (PF ¶ 18). Therein, Ridgewood stated that "[w]hile we are getting

---

7. There is a dispute as to whether Bergeron believes Swanson said that he would receive interest or dividend payments of 4%. In this court's view, the evidence would support a finding that Swanson guaranteed payments of 4% of Bergeron's investment—irrespective of whether it was characterized as a dividend or interest. Throughout their Local Rule 56.1 statement of facts, the Defendants have pointed to inconsistencies in Bergeron's sworn statements. Any assessment of Bergeron's credibility is an issue for the jury, not the court, and should be determined at trial.

8. Bergeron suggests that in deciding to invest in the Power Funds, he also relied on two letters that Ridgewood sent to investors in 1997 and in which it discussed its intention to achieve an IPO. (*See* Pl. Opp. Mem. (Docket No. 105) at 4–5). In February 1997, Ridgewood sent a letter to its investors in which it stated that "[i]n a few months when we close Ridgewood Power Trust V, we will have reached the critical mass for the Ridgewood

Power Trusts to combine into what we expect will be a very attractive IPO (Initial Public Offering)." (Pl.Ex. I at B000503). Later that year, in October 1997, Ridgewood sent another letter to investors in which it informed investors that participation in "Ridgewood Power's planned IPO" required an investment in one of the first five Power Trusts, and stated that "[w]e currently expect that the first five Ridgewood Power Trusts will have their combined IPO about 2 years after we close Ridgewood Power Trust V." (Id. at B000488). Although Bergeron received those documents, he could not recall whether he received them before making his initial investment in the Power Funds in 1998, and, consequently, this court will not rely on these documents. (Bergeron Aff. ¶ 16; Def. Ex.I at 179–81; Def. Ex. J at 20–21). Nevertheless, a jury could reasonably infer, from the dates on the letters and Bergeron's inquiries about plans for an IPO during the January 1998 telephone call with Swanson, that Bergeron saw the letters before making his investments.

the Fund fully invested you will receive quarterly dividend payments ... Once the Fund is fully invested we will switch over to monthly dividends for Trust V, just as we are making monthly dividends in each of the other four Ridgewood Power Trusts." (Pl.Ex. I at RW002668). Ridgewood also advised its investors that the Power Trust V Fund had closed at $90 million, and that the size of the Fund, "combined with the $120 million in the earlier Trusts give us a total critical mass that will greatly enhance the potential for our planned Initial Public Offering." (*Id.* at RW002669).

Consistent with the letter, Bergeron did receive quarterly payments of 1% from Ridgewood. (PF ¶ 18–19). The parties dispute whether these payments were "dividends," as Ridgewood described them in its correspondence to investors, or whether they constituted "interest." (*See* DF ¶¶ 91–92; PF ¶¶ 20–21). It is undisputed that Bergeron did not have a promissory note pursuant to which interest would be payable, (DF ¶ 92; PR ¶ 92), and that Ridgewood described the payments as "dividends" rather than interest payments throughout its communications with investors. (*See, e.g.,* Pl.Ex. 1 at RW002668 (2/11/98 letter); RW002661 (4/28/98 letter); RW002644 (7/28/98 letter)). However, there is also evidence in the record indicating that Ridgewood treated the payments as "interest" for tax purposes. (PF ¶ 20).

Bergeron continued to receive quarterly payments of 1% until January 30, 2001, when Ridgewood announced in a letter to its Power shareholders as follows:

We are suspending the quarterly dividends from each of the six Ridgewood Power Funds for the entire calendar year for two independent and valid reasons. First, in preparation for a possible IPO we want to strengthen each Fund and use cash to improve the per-

formance of the power plants. Second, the California power crisis has caused a temporary interruption in the cash flow from power plants owned by Ridgewood Power Trusts I, II and III.

(Pl.Ex. I at RW002766). Ridgewood further stated in its letter that "many Ridgewood Power investors are primarily interested in reliable, stable dividends, as opposed to potential capital appreciation," and assured its investors that "[i]f for any reason we are not able to effectuate our IPO we would make a catch up dividend a year from now." (Pl.Ex. I at RW002767–69; *see also* PF ¶¶ 24–25). Nevertheless, no Ridgewood Power IPO has occurred, and no catch-up payments were ever made to Ridgewood's Power Fund investors. (PF ¶ 26).

### Bergeron's Investment in the Power Growth Fund

On February 17, 1998, Ridgewood sent a letter to its Power investors in which it announced the formation of the Power Growth Fund. (PF ¶ 48; Pl.Ex. I at RW002662). Ridgewood described the Fund as "extremely similar to the five Ridgewood Power Trusts." (PF ¶ 48). However, Ridgewood informed investors that the Power Growth Fund would not be part of the Power IPO, stating:

Under our current plan The Ridgewood Power Growth Fund will not be part of the IPO. The Ridgewood Power Growth Fund is expected to close about a year after Power Trust V. Consequently, we anticipate that The Ridgewood Power Growth Fund will have its assets fully invested and showing stable or growing earnings probably about a year after we have the IPO for the first five Power Trusts. Once The Ridgewood Power Growth Fund matures, we anticipate exchanging The Ridgewood Power Growth Fund assets for shares of the Ridge-

wood Power IPO. We believe that the potential for built-in acquisitions by the IPO of The Growth Fund assets will substantially enhance the attractiveness of the IPO. We believe that the potential anticipated liquidity by merging with the IPO will substantially enhance the attractiveness of The Ridgewood Power Growth Fund. It is all part of the same business plan. We are just doing it in stages.

(Pl.Ex. I at RW002665). In a letter dated October 22, 1998, Ridgewood indicated that it intended to achieve the Power IPO in about 18 months, or by late April 1999. (Pl.Ex. I at RW002635).

Bergeron invested $100,000 in the Power Growth Fund on December 31, 1998. (DF ¶ 24). He claims that his decision to do so was based upon Ridgewood's representations regarding the IPO and Swanson's earlier promise of guaranteed interest payments. (PF ¶ 53). In connection with his investment in the Power Growth Fund, Bergeron certified that he had read the Power Fund Offering Memorandum. (DF ¶ 35). He also signed a Subscription Agreement containing the same representations and warranties that he had made in connection with his investment in the Power Trust V Fund. (DF ¶ 44; PR ¶ 44; Def. Ex. I at 152–53).

### Ridgewood's Efforts to Achieve an IPO

Between February 1997 and July 2002, Swanson sent twenty-three letters to Ridgewood's investors in which he discussed the Power IPO. (PF ¶ 29). Bergeron read each of the letters he received and trusted the information contained therein. (Bergeron Aff. ¶ 13). The parties dispute whether Ridgewood misled investors about the prospects for achieving an IPO. The Defendants assert that Ridgewood had every intention of accomplishing a public offering, but that "deteriorating market conditions impacted the ability of the projects

owned through the Power Funds to operate at a profit and derailed plans for an IPO...." (Def. Mem. (Docket No. 83) at 10). The plaintiff contends that Ridgewood "did nothing whatsoever to bring about an IPO" and that it "hid the fact that it lacked a plan, personnel, experience or even the earnings required to effectuate the IPO, and instead used the prospect of the Power IPO to supercharge its marketing for the Power funds and launch the Venture funds." (Pl. Mem. (Docket No. 105) at 8, 20–21). As detailed below, Bergeron has presented evidence to support his position. Therefore, the issue should be resolved by a jury.

Ridgewood first seriously considered taking the Power Funds public in 1997, after two larger competitors in the power business, AES and Calpine, went public with great success. (DF ¶ 66). However, in 1997, when Ridgewood announced its intention to achieve a Power IPO to its shareholders, Ridgewood had not engaged an investment bank or financial advisor, and no one on Ridgewood's senior management team had ever taken a company public. (PF ¶¶ 37–39; Pl.Ex. A at 50–51, 83). Moreover, although Gold explained that bringing a company public would have required "at least five people's almost full time job for months and months and months, right, the financial people, the management, CFO[,]" as of May 2000, Swanson had not assigned any staff to work exclusively on the Power IPO, and none of the individual Defendants had taken responsibility for effectuating an IPO. (See PF ¶¶ 36, 40–42, 44; Pl.Ex. A at 83–84). Additionally, Ridgewood had no written plan for achieving an IPO. (PF ¶¶ 46–47).

In January 1999, Ridgewood did retain Donaldson, Lufkin & Jenrette ("DLJ"), a leading investment bank in the independent power industry, to advise the compa-

ny on the IPO process and to determine whether an IPO was feasible. (PF ¶ 54; DF ¶ 67; PR ¶ 67). On January 13, 1999, Swanson notified shareholders of this development, announcing that the Power Funds had retained DLJ "to advise us on how to maximize shareholder value at our planned IPO." (Pl.Ex. I at RW002594). Swanson also informed investors that "Ridgewood Power, DLJ, and our lawyers will go through an exercise as if we were preparing for the IPO immediately. We want to identify issues today so that when we do bring out the IPO we will attract a higher price/earnings ratio." (*Id.*). However, DLJ was never engaged to be the underwriter for the offering. (PF ¶ 54).

Several months later, in April 1999, Ridgewood further informed its shareholders that it was relying on DLJ "to guide us in preparation for an IPO of the Ridgewood Power Trusts" and that "DLJ's advice about the IPO is very encouraging." (Pl.Ex. I at RW002576). Ridgewood also advised its shareholders that the IPO would be delayed for about another two years, until 2001.(*Id.*). Specifically, Ridgewood stated that it would follow DLJ's advice to include the Power Growth Fund in the IPO, and that while the inclusion of that Fund would "add about 50% to the size of the IPO[,]" it would also "delay the IPO to 2001 due to the time needed to get the funds invested." (*Id.*). Nevertheless, Ridgewood maintained that it was "extremely encouraged about the prospects for the Ridgewood Power IPO. DLJ is the leading investment bank in the Independent Power industry and we are receiving significant value by retaining them as our advisors." (*Id.* at RW002578).

Despite Ridgewood's representations about DLJ's role in the IPO process, DLJ was not vigorous in advising Ridgewood. (PF ¶ 57). Ridgewood and DLJ did not conduct any exercises as if they were pre-

paring for the IPO immediately, and DLJ did not provide Ridgewood with any written analysis regarding the feasibility of an IPO. (*Id.* ¶¶ 57–58). In fact, the record indicates that DLJ generated no written work product at all during the time of its engagement by Ridgewood. (*See* Nystrom Aff. ¶¶ 2–5). Furthermore, by July 1, 1999, about six months after Ridgewood had retained DLJ, the parties' relationship had come to an end. (Pl.Ex. A at 122–24). Due to DLJ's failure to perform the services Ridgewood had expected, Ridgewood decided not to pay it the second $100,000 of its $200,000 retainer. (*Id.*). Ridgewood did not advise investors of these developments. (PF ¶ 63). Although Ridgewood ultimately hired a law firm to advise it on taking the Power Funds public, it did not retain another investment bank or financial firm to assist it. (*Id.* ¶ 68; Pl.Ex. A at 124–25).

### The Feasibility of an IPO

As of 1999, Swanson understood that based on market conditions existing at the time, Ridgewood would need a market capitalization of $500 million (at a 15x or 16x multiple) in order to achieve a successful IPO, and that this would require earnings of over $30 million from the Ridgewood Power Fund projects. (PF ¶ 87; Pl. Ex. A at 136–45). Ridgewood had no positive earnings at that time. (PF ¶ 88; Pl. Ex. A at 142–43). Furthermore, as of 2001, the net operating cash flow for all of the Ridgewood Power Fund companies was $1.1 million, which would not have supported a $500 million IPO at any capitalization rate. (PF ¶ 91). Thus, it is undisputed that Ridgewood never had the profitability necessary to achieve an IPO. (*See* DF ¶ 86).

Nevertheless, Ridgewood continued to tell its shareholders that it intended to accomplish an IPO in 2001. For example, in August 1999 and December 2000, Ridge-

wood sent letters to its Power Fund investors in which it confirmed that it was planning an IPO by the end of 2001. (PF ¶¶ 71–72). Additionally, in a letter dated February 15, 2001, Ridgewood informed investors that it had entered a quiet period under the securities laws, stating, "[w]e must be very careful about what we say because we are contemplating an IPO at the end of this year." (PF ¶ 76).

In order for Ridgewood to complete an IPO, it was first necessary to have the Power Funds fully invested and experience a full year of earnings. (PF ¶ 78). It was also necessary to complete the merger of the Power Trusts, retain an investment bank, hire a public company CEO to run Ridgewood, file a registration statement and prospectus with the SEC, and conduct a road show. (*Id.*). However, as of early 2001, the only step Ridgewood had taken was to retain a law firm to assist it with the merger of the Power Trusts. (PF ¶ 79).

On March 30, 2001, Ridgewood sent a letter to investors in which it noted that "the IPO market is exceedingly gloomy" and "has already been moribund for about one year (since May, 2000). . . ." (Pl.Ex. I at RW002751). Still, Ridgewood continued to tell investors that it was taking steps necessary to accomplish the IPO. Thus, on September 27, 2001, Ridgewood sent investors a status report in which it stated that "Ridgewood Power is continuing to prepare for the merger of the various Ridgewood Power Trusts and related entities" and represented that it would "work towards our goal of a consolidation of the funds which we firmly believe will maximize the value of your Ridgewood investment." (Pl.Ex. I at RW002703).

About five months later, in February 2002, Ridgewood notified its Power Fund shareholders that it would not be seeking approval to merge the Power Trusts that

year, but that it would do so as soon as conditions with respect to the Trusts and the general market would permit. (Pl.Ex. I at RW002958). Ridgewood stated that the primary problem for the IPO market in the independent power sector, and the reason for the delay of the merger, was Enron and the fall-out from Enron on companies like Calpine. (*Id.* at RW002961). It also noted that "AES fell earlier in 2001 for issues unrelated to Enron" and that the entire sector was in disfavor. (*Id.*). However, Ridgewood confirmed its goals of increasing the value of shareholder assets, increasing or recommencing dividends, and providing liquidity. (*Id.* at RW002961–62).

On April 4, 2003, Ridgewood sent a letter to its investors in which it stated that "[t]he Power and Energy Funds are designed to generate high yielding, tax-deferred cash flow[,]" and that "because they are structured to generate high, current cash flow, they are not subject to stock market risk." (Pl.Ex. I at B 001624) (emphasis omitted). Bergeron asserts that the language used in this letter contrasted sharply with the Defendants' earlier statement that Ridgewood's "objective is to provide our Shareholders with liquidity at a maximum gain," and amounted to an admission that there would be no Power Fund IPO. (PF ¶¶ 83–84). He claims that at some point after he received the April 2003 letter, he realized that the Defendants had strung him along, and that no Power IPO was going to take place. (PF ¶ 85).

Eventually, Ridgewood confirmed Bergeron's assessment. In a letter dated July 9, 2004, Ridgewood informed investors that:

> The macro-economic events of September 11, 2001, the collapse of the IPO market, and the California Energy Crisis put an immediate halt to our plans

for an IPO. The subsequent financial blood bath in the Independent Power Generation sector makes a near term IPO highly unlikely, even though Ridgewood is determinedly increasing our cash flow, asset by asset. The collective Ridgewood Renewable Power Funds' cash flow has improved dramatically since early 2003, and should improve dramatically by the end of next year. Despite the improved cash flow that Ridgewood reasonably projects, an IPO appears unlikely at least for several years....

(Pl.Ex. I at RW003087).

### The Venture Funds

On December 9, 1998, Ridgewood distributed a letter to its Power Fund investors announcing the launch of Venture Fund I, which would aim to maximize capital gain by investing in a portfolio of companies that would be taken public or sold within two to four years. (PF ¶ 95; Pl.Ex. J at RW001002, RW001004). In its letter, Ridgewood also stated in relevant part that:

> [t]he primary focus of the Venture Fund will be on late stage, preIPO companies which already have developed a superior technology or product and which now need immediate capital to expand manufacturing and marketing. We are not interested in finding people with brilliant ideas and financing the development of those ideas. We are interested in nurturing brilliant ideas which have already been developed.

(Pl.Ex. J at RW001003) (emphasis omitted). This was consistent with representations that were made by Gold, the manager of the Venture Funds, during an investor conference call that Bergeron participated in prior to making any investments in the Funds. (See Pl.Ex. F at 109–11). According to Bergeron, Gold

said that Venture I would only invest in portfolio companies with developed products, revenue streams and distributions channels rather than in seed stage or dot.com companies. (Bergeron Aff. ¶ 18). Bergeron claims that despite these representations, the Venture Funds invested in seed companies and internet-based companies in early stages of development, including such companies as Medibuy, Horsepower.com, Myrio, Feedroom and NovaCrystals. (PF ¶ 121).

Ridgewood further told investors that "[w]e have the skills and have developed the infrastructure to evaluate and manage investments in their pre-IPO stage. The work that we have been doing to prepare the Ridgewood Power Trusts for an IPO has focused our attention on the requirements and extraordinary opportunities of pre-IPO companies." (Pl.Ex. J. (12/9/98 letter) at RW001002). Bergeron claims that he ultimately decided to invest in the Venture Funds because of Gold's assurances about the nature of the investments and the Defendants' representations regarding their expertise in the venture marketplace and their experience in preparing for the Power Fund IPO. (Bergeron Aff. ¶ 18; PF ¶ 105). Between April 26, 1999 and January 7, 2002, Bergeron invested a total of $700,000 in three separate Venture Funds, including Venture Fund I, Venture Fund II, and Venture Fund I–B. (DF ¶¶ 122, 126).

### Bergeron's Receipt of the Venture Fund Offering Memoranda

Prior to making investments in each of the Venture Funds, Bergeron received an Offering Memorandum that provided information about the nature of the investment and the risks involved. Therein, Ridgewood warned prospective shareholders that the investments were speculative and involved "a very high level of risk for the Investor." (DF ¶¶ 110–12; PR ¶¶ 110–12).

As was the case with the Power Funds, the Offering Memoranda for the Venture Funds also authorized potential investors to ask questions and receive information from the Fund, but cautioned that "[t]he Investor should rely on that additional information only if it is given in writing and signed on behalf of the Fund." (DF ¶ 112; PR ¶ 112).

With respect to the nature of the Venture Fund investments, the Offering Memoranda provided, among other things, that "[t]he Fund will prefer making investments in companies with existing products that need capital to bring products to market or to expand, rather than in 'seed-stage' companies that are developing products, but the Fund may invest in either type of company." (Def. Ex. C at RW000337). Additionally, in a section entitled "Diversification Considerations," the Memoranda read as follows:

> The Funds will attempt to reduce the high risks of venture capital programs by investing in a number of companies serving different markets and at different stages of maturity, (ii) limiting the Funds' investments in very early-stage companies, and (iii) investing in Portfolio Companies with other investment programs sponsored by the Manager or its affiliates and [possibly] with other professional venture capital investors ... THERE IS NO ASSURANCE THAT THE FUNDS WILL RECEIVE SUFFICIENT CAPITAL TO CARRY OUT THEIR INVESTMENT AND RISK-REDUCTION OBJECTIVES OR THAT THEY WILL BE ABLE TO INVEST SUCCESSFULLY.

> \* \* \*

> Actual portfolio composition may be dictated by market conditions and funding opportunities that are beyond the Manager's control. Consequently, there can be no assurance that these portfolio management objectives can be met.

(DF ¶ 112; PR ¶ 112) (emphasis in original).

Among the risks described in the offering documents was the risk that there were material, potential conflicts of interest involved in the operation of the Fund, including, among others, potential conflicts created by "competing demands for allocating investment or divestiture opportunities among programs," and conflicts arising between the interests of the particular Venture Fund "and other programs sponsored by [Ridgewood Capital] and its Affiliates if those programs are co-owners of Portfolio Companies with the Fund[.]" (Def. Ex. C at RW000375). More specifically, the Offering Memoranda provided:

> **Co–Investment and Similar Conflicts.** A conflict of interest might arise if at any given time an opportunity to invest in a Portfolio Company would be suitable for more than one Investment Program, thus requiring the Manager to choose among the suitable Programs. The Manager may also determine that more than one Investment Program should invest in a Portfolio Company, in which case those Programs will be co-owners. The Fund expects that most of its investments will be made concurrently with investments by the Institutional Fund on similar terms and conditions and that the conflicts of interest described here may occur in most cases.

(DF ¶ 134; PR ¶ 134; Def. Ex. C at RW000403) (emphasis in original).

The Co–Investment provisions described two set of policies for the Fund Manager to follow in resolving such conflicts. (DF ¶ 135; PR ¶ 135; Def. Ex. C at RW000403). The first policy, which is relevant to the instant case, was to apply in instances where more than one Venture Fund had money available to invest at

about the same time and under similar terms. (*Id.*). It provided that Ridgewood would determine how much each Fund would invest based on a variety of factors, including but not limited to, "the effects of the investment on the diversification of each [Fund's] portfolio, potential alternative investments, the effects an investment by either [Fund] would have on the [Fund's] risk-return profile, the estimated tax effects of the investment on each [Fund], the amount of funds available and the length of time those funds have been available for investment." (Def. Ex. C at RW000403). Significantly, the Offering Memoranda went on to state:

If more than one [Fund] has funds available for investment and the factors discussed above and other considerations indicate that the Portfolio Company has approximately equal benefit for each [Fund], the Manager will generally allocate the opportunity first to the [Fund] that was first organized, to the extent of its funds that can be prudently invested in that opportunity. In general the Manager will seek to apply all uninvested funds of that [Fund] to the opportunity, unless doing so would cause the [Fund] to be significantly overcommitted to a Portfolio Company. Any remaining investment opportunity would then be offered successively to later-organized [Funds] on the same basis.

(*Id.* at RW000403–04; *see also* DF ¶ 136; PF ¶ 127).

In addition to receiving and reviewing the Offering Memoranda, Bergeron signed a Subscription Agreement before investing in each Fund. (DF ¶ 116; PR ¶ 116). Therein, Bergeron made various representations and warranties, including that he had read and understood the Offering Memorandum and was "**not** relying on any oral statement made to me or written material supplied to me and not otherwise

contained in the Memorandum in deciding to purchase Shares subscribed for herein." (Def. Ex. EE at RW000756–57; Def. Ex. FF at RW000783) (emphasis in original). He further agreed that "I have been advised that the Shares involve a high degree of risk and that there are no assurances that I will recover my investment or receive any return at any time." (Def. Ex. EE at RW000758; Def. Ex. FF at RW000784).

### Bergeron's Investment in Venture I

Unlike his investments in the Power Funds, Bergeron's investments in the Venture Funds were made through an initial downpayment and several follow-on capital calls, which occurred as the Venture Fund identified specific investments. (DF ¶ 123; PF ¶ 109). Thus, on April 26, 1999, Bergeron committed to invest $250,000 in the Venture I Fund. (DF ¶ 122; PF ¶ 108). On that same day, he made an initial downpayment of $85,000, but the remaining amount was invested pursuant to four separate capital calls between June 2, 1999 and October 20, 1999. (DF ¶ 126; PF ¶ 109). Ridgewood provided Bergeron with information regarding the Portfolio Companies in which the Fund was investing before Bergeron made the initial investment, and prior to each capital call. (DF ¶ 124; PR ¶ 124). Although Bergeron had the option of making or declining to make each of the capital calls, any refusal to participate in a capital call would have resulted in the loss of a portion of his deposit and the forfeiture of the right to participate in future capital calls for the Fund. (PF ¶ 110).

The lead investment of the Venture I portfolio was a company known as Medibuy. (DF ¶ 214). Venture I invested $3 million in Medibuy in exchange for 20% ownership. (Def. Ex. D at 66). Although Gold told investors that Medibuy alone ought to have achieved fabulous returns

and made the Fund's model, the company failed to achieve an IPO, was ultimately sold off, and returned only 13 cents on the dollar to investors of Venture I. (PF ¶¶ 117, 119–20; DF ¶ 159). The parties dispute whether Medibuy was a good investment that was adversely affected by the collapse of the high technology market in the 2001–02 time frame or whether it was a more risky investment than Ridgewood led investors to believe. (*See* DF ¶¶ 214–21; PR ¶¶ 214–21; PF ¶¶ 115–21). In any event, it is undisputed that Venture I was a total loss. (PF ¶ 122; Pl.Ex. C at 79).

### Bergeron's Investment in Venture II

On October 22, 1999, Ridgewood sent a letter to its Venture Fund shareholders announcing the formation of the Venture II Fund. (Pl.Ex. J at RW001103). Ridgewood told its shareholders that it was offering Fund II because Fund I was fully invested. (*Id.*). Ridgewood also stated that Venture II would be making an early stage equity investment in an internet commerce company called Horsepower.com by investing, along with Venture Fund I, in the first round, or "A Round," of financing. (*Id.* at RW001104). Ridgewood explained that while each of Venture I and Venture II would invest in the "A Round" of financing, only Venture II was expected to make follow-on investments in subsequent pre-IPO financing rounds of Horsepower.com. (*Id.* at RW00 1104–05). It further told its investors that "Venture Fund I is not in the position to invest millions of dollars more in Horsepower.com because we are doing the investment out of cash reserves from the various capital calls." (*Id.* at RW001105). Therefore, Ridgewood informed investors, "[i]f you would like a larger position in Horsepower.com, you will have to join Fund II." (*Id.*). Bergeron claims that Ridgewood offered further investment opportunities in Horsepower.com only through Venture II "[a]s part of its hook to get investors in Venture I to chase their investments to Venture II[.]" (PF ¶ 125).

On November 11, 1999, Bergeron purchased one share in Venture II for $250,000, and on March 17, 2000, he purchased another one-half share in the Fund for $125,000. (DF ¶ 122). Bergeron made an initial deposit and then a series of payments and capital calls between March 6, 2000 and December 14, 2000. (*Id.* ¶ 126). Like Venture I, Venture II was a total loss. (PF ¶ 130).

### Alleged Transfer of Investment Opportunities to Later Funds

Bergeron claims that, as illustrated in the case of Horsepower.com, Ridgewood consistently gave away investment opportunities to new funds, thereby forcing investors to participate in the newly created Fund. (*See* PF ¶¶ 132–36). It is undisputed that Funds which participated in initial or "A Round" financing for portfolio companies obtained the right to participate in subsequent, follow-on financing, and that in many cases, Ridgewood transferred the follow-on financing rights of earlier established Funds to later established Funds without providing any payment or other consideration to the earlier Fund. (PF ¶ 131–33; Pl.Ex. C at 83–96; 137–39). Accordingly, shareholders who wanted further investment opportunities with those portfolio companies would need to invest in newly created Funds. Ridgewood offered its existing investors a 10% discount for investing in a subsequent Fund. (PF ¶ 138; Pl.Ex. D at 320–21).

Bergeron contends that Ridgewood was motivated to lure its shareholders into new Venture Funds by the fact that new funds generated substantial investment fees. (*See* PF ¶¶ 154–57). Over 90% of Ridgewood Capital's revenue came from invest-

ment fees, and Ridgewood received 5.6 cents for every dollar invested in the Funds. (*Id.* ¶¶ 154–55). Furthermore, Ridgewood charged an annual management fee of 1.5% of each Fund's capital contributions. (*Id.* ¶ 156). Thus, when Ridgewood was not generating profit participation, it made money by opening new funds. (*Id.* ¶ 157).

Gold denied that fees ever drove Ridgewood's decisions to create new funds or to allocate capital. (Def. Ex. D at 102–03). Moreover, Gold explained that Ridgewood gave follow-on financing opportunities to new funds in instances when it believed that the earlier established fund had enough of an investment in the portfolio company and Ridgewood determined that it was not prudent to make an additional investment, or when the earlier established fund was fully invested. (*See* Pl.Ex. C. at 85–90). The record demonstrates that Ridgewood informed its shareholders of its decisions to allocate such investment opportunities to new funds, and explained the basis for those decisions. For example, as described above, Ridgewood explained that it was giving the rights to follow-on financing in Horsepower.com to Venture II and not Venture I because Venture I was not in a position to invest millions of dollars more in the company. (Pl.Ex. J at RW001105 (10/22/99 letter)). Additionally, as described below, Ridgewood explained to investors, when it created the Venture I–B Fund, that it was not taking opportunities away from existing funds because those funds either were fully invested and unable to participate in additional financing, or were already investing to the extent that had been planned earlier. Bergeron has presented no facts to indicate that Ridgewood's explanations were untrue or were otherwise made without consideration of the factors set forth in the co-investment provisions of the Venture Fund Offering Memoranda.

### Bergeron's Investment in Venture I–B

On November 8, 2001, Ridgewood sent a letter to its Venture I investors notifying them of the formation of the Venture I–B Fund. (PF ¶ 146; Pl.Ex. J at RW001431). Ridgewood told its investors that the new Fund would "invest in a very small number of what we believe are the very best companies with which Ridgewood Capital is involved[,]" including "four or five Portfolio Companies which are investments of Fund I" and "investments of Fund II or Fund III...." (Pl.Ex. J at RW001431). Ridgewood also said that it was forming the Venture I–B Fund "because we want to improve your overall investment return and we want to improve our track record." (*Id.* at RW001432).

Ridgewood represented that although the Venture I–B Fund would participate in investments of other Venture Funds, it would not be taking opportunities away from those Funds. (*Id.* at RW001431–32). In particular, Ridgewood stated that the Venture I Fund was fully invested and unable to participate in the available investment rounds. (*Id.* at RW001432). It also explained that the investment by Venture I–B in Nova Crystals, a company in which Venture Funds II and III had stakes, would be an additional investment that would not limit the amounts that the earlier established Funds had already planned to invest. (*Id.*).

Bergeron invested $75,000 in Venture I–B by making a single payment on January 7, 2002. (DF ¶¶ 122, 126). He claims that his decision to invest in the Fund was based on representations made by Swanson and Gold that Venture I–B presented a chance for him to recover some of the losses he had sustained in connection with Venture I, and that the new Fund was going to invest in the best companies in the Venture Fund portfolios. (PF ¶ 150).

Bergeron's investment in Venture I–B was a total loss. (*Id.* ¶ 153; DF ¶ 226; PR ¶ 226).

Additional factual details relevant to this court's analysis are provided below.

## III. ANALYSIS

### A. *Summary Judgment Standard of Review*

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.1996) (quotations and citations omitted). A material fact is one which has "the potential to affect the outcome of the suit under the applicable law." Id. (quotations and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. *See id.* at 324, 106 S.Ct. at 2553. "[T]he nonmoving party 'may not rest upon mere allegation or denials of his pleading,' " but must set forth specific facts showing that there is a genuine issue for trial. *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir.1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)). The court must view the record in the light most favorable to the non-moving party

and indulge all reasonable inferences in that party's favor. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993). "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." *Walsh v. Town of Lakeville*, 431 F.Supp.2d 134, 143 (D.Mass.2006).

### B. *Count I: Alleged Violation of Massachusetts Uniform Securities Act*

■ In Count I of his Second Amended Complaint, Bergeron alleges that the Defendants are liable under the Massachusetts Uniform Securities Act, Mass. Gen. Laws ch. 110A, § 410 ("Securities Act"). In order to establish a violation of the Securities Act, Bergeron must prove that "(1) the defendant 'offers or sells a security'; (2) in Massachusetts; (3) by making 'any untrue statement of a material fact' or by omitting to state a material fact; (4) the plaintiff did not know of the untruth or omission; and (5) the defendant knew or 'in the exercise of reasonable care [would] have known,' of the untruth or omission." *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 52, 809 N.E.2d 1017, 1026 (2004) (quoting Mass. Gen. Laws ch. 110A, § 410(a)(2)) (alteration in original). Bergeron claims that in connection with the sale of shares in the Funds, the Defendants made misrepresentations, which they knew or should have known were false at the time they were made, regarding guaranteed interest payments, Ridgewood's plan for an IPO, DLJ's role in the IPO, the timing of and fiscal reality concerning the IPO, and Ridgewood's experience with the Power IPO and venture investing. (Pl. Opp. Mem. at 22).

■ The Defendants contend that the plaintiff's claims under the Act must fail because Bergeron cannot establish that any of the Defendants' statements were false or that any alleged misrepresentations concerned material facts as opposed to "non-actionable opinions, projections, expectations, beliefs, hopes, statements of potential, promises, and 'puffery.'" (Def. Mem. at 94). This court finds that there are genuine issues of material fact that preclude summary judgment for the Defendants on these grounds. Accordingly, this court recommends that the motion be denied with respect to Count I.

As an initial matter, the Defendants argue that Bergeron has not presented evidence showing that he actually read or heard the alleged misrepresentations before making his various investment decisions. (*Id.*). However, the plaintiff does not need to prove that he relied on the untrue statements or omissions in order to prevail on a claim under the Securities Act. *See Marram,* 442 Mass. at 53, 809 N.E.2d at 1026–27 ("because G.L. c. 110A, § 410(a)(2), holds the seller liable for inaccurate disclosure or nondisclosure of material information, foremost among the elements that the buyer does not have to prove is reliance.") (quotations and citation omitted). Rather "[a]ll that is required is ignorance of the untruth or omission." *Id.* at 54, 809 N.E.2d at 1027.[9]

### *Falsity of Alleged Statements*

With respect to the issue of falsity, Bergeron has presented facts supporting an inference that the Defendants made statements which they knew or should have known were false when made. In particular, the record shows that beginning in 1997, the Defendants repeatedly made statements to the effect that they were planning for an IPO, even though Ridgewood had not retained an investment bank or financial advisor, had no team in place to plan or otherwise effectuate an IPO, had no written plan for achieving an IPO and had no senior management employees who had taken a company public. (*See* PF ¶¶ 29, 36–42, 44, 46–47; Pl.Ex. A at 83–84). Additionally, when the record is viewed in the light most solicitous to the plaintiff, it reveals that Ridgewood never even performed an evaluation as to the feasibility of an IPO. (*See* PF ¶ 58; Nystrom Aff. ¶¶ 2–5). These facts support an inference that

9. Although Bergeron is not required to establish reliance as an element of his claim under the Act, it is not clear that he can base his claim on post-investment misrepresentations, as he asserts. In *Marram,* the court determined that post-investment statements can support a claim for unfair and deceptive trade practices. *Marram,* 442 Mass. at 62, 809 N.E.2d at 1033. However, it did not address whether such statements could provide a basis for the plaintiff's claim under the Securities Act, which in that case involved a charge of preinvestment materially misleading oral statements. *See id.* at 55, 809 N.E.2d at 1028. In any event, it is not necessary to resolve that issue at this stage because Bergeron has presented evidence showing that Ridgewood made many of the challenged statements prior to at least some of his investment decisions. For example, but without limitation, Bergeron has shown that Swanson's oral statements regarding the alleged guaranteed interest payments and Ridgewood's intent to achieve a Power IPO in two or three years occurred before the plaintiff made any of his investments in the Ridgewood Funds. (*See* Pl.Ex. E at 57–58). Additionally, Ridgewood continued to make representations indicating that it was planning an IPO before Bergeron had even made his second investment in the Power Growth Fund. (*See* Pl.Ex. I at RW002669 (2/11/98 letter referencing planned IPO), RW002665 (2/17/98 letter referencing IPO for first five Power Trusts), RW002635 (10/22/98 letter indicating intention to achieve IPO by late April 1999)). Therefore, even if post-investment statements are irrelevant to claims under the Securities Act, there is adequate evidence to warrant the denial of summary judgment on Bergeron's claim.

the Defendants made representations concerning its plans for an IPO knowing that the representations were false, and intentionally misled their investors into believing there was a realistic prospect for an IPO, even though they had not done anything to achieve that goal or even to determine whether an IPO would be viable.

The record further supports a conclusion that at least as of 1999, the Defendants knew that Ridgewood's earnings did not come close to supporting an IPO. (PF ¶¶ 87–88, 91; Pl.Ex. A at 135–43). However, they did not disclose that information to their investors. Instead, the Defendants continued to tell investors that Ridgewood was planning to accomplish an IPO in 2001. (*See* PF ¶¶ 71–72). A jury could find, based on these facts, that Ridgewood knew or should have known that there was never any likelihood of an IPO, but wanted its shareholders to think otherwise.

Similarly, a jury could find that Swanson's representation that Bergeron would receive guaranteed payments of 4% was knowingly false when made. It is undisputed that nothing in the Power Fund offering documents guaranteed shareholders a return on their investments. (*See* Def. Ex. B at RW000010 (warning that there was no assurance that Ridgewood would be capable of meeting its objective of generating cash flow for distribution to investors)). Furthermore, the Subscription Agreement that Ridgewood provided to Bergeron required him to acknowledge that "there are no assurances that I will ... receive any return at any time." (Def. Ex. V at RW000729). Given the inconsistencies between the offering materials and Swanson's statement, a jury could reasonably conclude that Swanson's representation was false. Additionally, in light of

Swanson's status at Ridgewood and his role in answering investor questions about the Fund, a jury could also determine that Swanson "knew or in the exercise of reasonable care [would] have known," that his representation concerning guaranteed payments was false. *Marram*, 442 Mass. at 52, 809 N.E.2d at 1026 (quotations and citation omitted; alteration in original).

### Nature of Alleged Misrepresentations

This court also disagrees with the Defendants' characterization of the challenged statements as non-actionable predictions, opinions or puffery. Certain of those representations and omissions, including but without limitation the alleged promise of guaranteed interest payments, Ridgewood's failure to inform investors that its relationship with DLJ had ended, its failure to tell investors that it had not evaluated the feasibility of an IPO and the Defendants' representation to prospective Venture Fund investors that they had gained experience preparing for the Power IPO, are "susceptible of knowledge" and can therefore be understood as factual statements or omissions rather than opinions or forecasts. *Stolzoff v. Waste Sys. Int'l, Inc.*, 58 Mass.App.Ct. 747, 760, 792 N.E.2d 1031, 1041 (2003) (quotations and citation omitted). Furthermore, "[i]n general, the [challenged] statement or omission must concern a fact, and not an opinion or belief, unless such an opinion is inconsistent with facts known at the time they are made." *Marram*, 442 Mass. at 57 n. 24, 809 N.E.2d 1017. *See also Glassman v. Computervision Corp.*, 90 F.3d 617, 627 (1st Cir.1996) ("While forecasts are not actionable merely because they do not come true, they may be actionable to the extent they are not reasonably based on, or are inconsistent with, the facts at the time the forecast is made.").[10] To the

10. *Glassman* involved claims under Sections 11 and 12(2) of the Securities Act of 1933, 15

extent the Defendants' statements about the Power IPO could be viewed merely as forecasts of a possible future event, those statements remain actionable if they are undermined by inconsistent facts that were known to the Defendants at the time.

That is the case here. When viewed in Bergeron's favor, the record shows that Ridgewood repeatedly led investors to believe that an IPO was possible and that it was actively pursuing that goal despite having no factual basis for concluding that a public offering was financially achievable and despite having knowledge of facts, such as the lack of any plan or team in place for effectuating an IPO, that undermined such representations.

■ Additionally, "[w]hat might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir.1989) (involving claim under section 12(2) of Securities Act). In the instant case, Swanson's representation that there would be guaranteed payments could be viewed as a means of convincing Bergeron to invest in what was described in the Power Fund Offering Memorandum as a high risk investment. Similarly, Ridgewood's repeated statements concerning the upcoming Power IPO could be seen as an effort to assure shareholders as to the future success of their investments and induce them to make further investments in Ridgewood funds. Consequently, this

court concludes that the Defendants are not entitled to summary judgment on Bergeron's claim under the Securities Act.

### C. Count II: Claim for Breach of Fiduciary Duties

■ Bergeron claims, in Count II of his Second Amended Complaint, that the Defendants breached their fiduciary duties by creating new Venture Funds and shifting more desirable investment opportunities to the later-established Funds. He contends that "[b]y shifting more favorable opportunities to later-established funds, Ridgewood has wrongfully usurped Mr. Bergeron's investment opportunity as a member of the earlier-established funds." [11] (2d Am. Compl.¶ 59). The plaintiff has presented no arguments in his brief in opposition to the Defendants' motion for summary judgment on this claim. The court must, nevertheless, address the motion for summary judgment "to determine whether judgment would be legally appropriate." *Aguiar–Carrasquillo v. Agosto–Alicea*, 445 F.3d 19, 25 (1st Cir.2006) (internal quotation omitted). For the reasons detailed below, this court finds that the Defendants have shown that they are entitled to a judgment in their favor with respect Count II.

The Defendants agree that a manager or trustee of a business trust, like a director and officer of a corporation, owes the trust and its investors fiduciary duties of care and loyalty, and that Ridgewood therefore owed those duties to the plaintiff in connection with his investments in the

U.S.C. §§ 77k(a), 77l(2). The Massachusetts Uniform Securities Act "is almost identical with § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2)." *Marram*, 442 Mass. at 50–51, 809 N.E.2d at 1025 (quotations and citation omitted). Therefore, Massachusetts courts look to Federal decisions under § 12(2) in interpreting Mass. Gen. Laws ch. 110A, § 410(a)(2). *Id.* at 51, 809 N.E.2d at 1025.

11. For purposes of the motion for summary judgment, the court will assume that corporate opportunity belongs to Bergeron. However, the Defendants have argued that the opportunity would actually belong to the earlier Funds and that it is a derivative claim which Bergeron has no standing to make.

Venture Funds.[12] (Def. Mem. at 20). Thus, it is undisputed that the Defendants had duties to protect the interests of the Funds and "to refrain from doing anything that would work injury to the [Funds], or to deprive [them] of profit or advantage which [their] skill and ability might properly bring to [them], or to enable [the Funds] to make in the reasonable and lawful exercise of [their] powers." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del.1993) (quoting *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del.1939)).[13] Nevertheless, Bergeron has failed to establish that Ridgewood usurped corporate opportunities by authorizing the investments by the new funds.[14]

As an initial matter, the evidence establishes that Ridgewood fully discussed in its Offering Memoranda the potential for conflicts of interest created by the competing demands for allocating investments among the Venture Funds, and identified the criteria that would be used in making the allocation decision. (*See* DF ¶ 132; PR ¶ 132; Def. Ex. C at RW000403–04). Bergeron has not put forth any evidence to establish that Ridgewood did not act in accordance with the factors set forth in the co-investment provisions of the Venture Funds' Offering Memoranda for determining how to allocate investment opportunities between Funds. Under Delaware law, a fiduciary's duties may be expanded, restricted, or eliminated by provisions in a governing written instrument, as long as the governing instrument does not eliminate the implied contractual covenant of good faith and fair dealing. 12 Del. C. § 3806(c). The undisputed facts establish that, by complying with the terms of the Offering Memoranda, Ridgewood was acting in accordance with its fiduciary duties, and the motion for summary judgment should be allowed.[15]

12. Notably, the Venture Fund Offering Memoranda, in a section entitled "Fiduciary Responsibilities of the Manager," provides among other things: "[t]he Investors and the Fund may have a number of legal remedies against the Manager in the event it were to breach its duties. Under the law of Delaware, the Manager is accountable as a fiduciary and must exercise the utmost good faith and integrity in handling Fund affairs." (Def. Ex. C at RW000400).

13. It is undisputed that, consistent with a prior ruling from the District Judge, Delaware law controls Bergeron's claim for breach of fiduciary duty. (*See* Def. Mem. at 20).

14. To the extent that Bergeron is challenging the selection of investments, Ridgewood's decisions would be protected by the business judgment rule. That rule creates a presumption that a defendant "acted on an informed basis and in the honest belief that they acted in the best interests of the [trust]." *Zoren v. Genesis Energy, L.P.*, 836 A.2d 521, 528 (Del. Ch.2003). The plaintiff has the burden of rebutting this presumption and must, as an initial matter, demonstrate that the Defendants "appeared on both sides of [a] transaction or derived a personal benefit from a transaction in the sense of self-dealing." *Id.* If the plaintiff fails to meet this burden, "the business judgment rule attaches to protect [the fiduciaries] and the decisions they make, and [the] courts will not second-guess these business judgments." *Cede & Co.*, 634 A.2d at 361. On the other hand, if the plaintiff is able to rebut the presumption, the burden shifts to the defendant to prove "the entire fairness" of the decision to the plaintiff. *Id.* For purposes of his claim for breach of fiduciary duty, Bergeron has not challenged Ridgewood's decisions concerning the selection of investment opportunities. Therefore, he has not refuted the presumption afforded under the business judgment rule.

15. In light of this court's conclusion that the Defendants are entitled to summary judgment on the merits of Bergeron's claim for breach of fiduciary duty, it is unnecessary to address the Defendants' arguments that the claim is derivative and barred by Bergeron's failure to comply with the demand requirements of Fed. R.Civ.P. 23.1, and that the claim is barred by the statute of limitations.

Moreover, Bergeron has not met the elements of a usurpation of corporate opportunity claim. Under Delaware law, the corporate opportunity doctrine, which prohibits a corporate fiduciary from placing his own interests ahead of the interests of the corporation, defines the parameters of the fiduciary duty in instances of potential conflict. *See Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154 (Del.1996) (describing corporate opportunity doctrine). To establish that a fiduciary wrongfully took a business opportunity for its own, a plaintiff must establish that

(1) the corporation is financially able to exploit the opportunity;

(2) the opportunity is within the corporation's line of business;

(3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation.

*Id.* at 155. "No one factor is dispositive and all factors must be taken into account insofar as they are applicable." *Id.* In addition, "the determination of whether or not a [fiduciary] has appropriated for himself something that in fairness should belong to the corporation is a factual question to be decided by reasonable inference from objective facts." *Id.* (quotations and citation omitted).

Bergeron has not provided sufficient facts to support the conclusion that Ridgewood misappropriated a corporate opportunity. Bergeron has not shown that the earlier established Funds were capable of participating in follow-on financing or that it was in their interests to do so. Rather, the evidence shows that in instances where Ridgewood chose to allocate available investment opportunities to newly created Funds, the earlier Funds were fully invested, were already investing in the company to the extent planned, or that further investments in the company would expose the earlier Fund to too much risk from a single entity. (*See* Pl.Ex. C at 85–90; Pl. Ex. J at RW001105 (Oct. 22, 1999 letter), RW001432 (Nov. 8, 2001 letter)). For these reasons as well, the Defendants' motion for summary judgment as to Count II should be allowed.

### D. *Count III: Claim for Breach of Contract*

Bergeron's breach of contract claim is based on Ridgewood's failure to fully perform on its alleged promise to make 4% interest payments, its failure to work toward achieving an IPO, its failure to allocate investment opportunities to earlier established Venture Funds first and its decisions to invest in "seed stage" companies. (*See* Pl. Opp. Mem. at 30–36). This court recommends that the Defendants' motion be allowed except with respect to Bergeron's claim concerning the IPO.

#### *Guaranteed Payments*

According to Bergeron, he had one conversation with Swanson around the time he signed the Subscription Agreements for the Power Funds, and based on that conversation he is entitled to his 4% payments. Since such a promise conflicts with the express and unambiguous terms of the written documentation, it is unenforceable.

Under Delaware law[16] of contract interpretation, "[u]nambiguous written agreements should be enforced according to their terms, without using extrinsic

---

**16.** The District Court has ruled that Delaware law governs Bergeron's contract and related claims. *See* Docket, January 10, 2007.

evidence 'to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.'" *MBIA Ins. Corp. v. Royal Indem. Co.,* 426 F.3d 204, 210 (3d Cir.2005) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del.1997)). "A contract is not ambiguous merely because the parties disagree about its proper interpretation. Whether a contract is ambiguous is determined according to an objective, reasonable-person standard and is a question of law." *Id.* This court finds that under the unambiguous terms of the Power Fund offering documents, Ridgewood did not promise to make interest payments or otherwise guarantee a return on its shareholders' investments.

When Bergeron signed the Subscription Agreements for the Power Funds, he agreed that he had been advised that there were no assurances that he would receive "any return at any time." (Def. Ex. V at RW000729). He also confirmed that he had read the Offering Memorandum and that he understood "all of the terms, conditions and risks as stated in the Memorandum and the supplements." (*Id.* at RW000727–28). Nothing in the Offering Memorandum provides for a guaranteed return on investments. Rather, under the unambiguous terms of the document, Ridgewood represented that while its ob-

jectives included the generation of current cash flow for distribution to investors from the operation of power generating facilities, there was "no assurance that [Ridgewood would] be able to meet those investment objectives." (Def. Ex. B at RW000010). Bergeron has not identified any language in the Offering Memorandum or in the related documents that conflicts with this representation or otherwise creates an ambiguity with respect to Ridgewood's payment obligations. Under Delaware law, Bergeron cannot rely on his conversation with Swanson to vary or contradict the unambiguous terms of the Offering Memorandum. *See Pellaton v. Bank of New York,* 592 A.2d 473, 478 (Del.1991) (where contractual language is clear and unambiguous on its face, trial court may not consider parol evidence "to interpret it or search for the parties' intentions.") (quotations, punctuation and citation omitted).[17]

In addition, the Offering Memorandum and the Subscription Agreements contained unambiguous language precluding investors' reliance on oral representations. (*See* Def. Ex. B at RW000007; Def. Ex. V at RW000728). For this reason as well, Bergeron cannot establish that Ridgewood was contractually bound by Swanson's oral statements.[18]

17. Although Bergeron characterizes Swanson's statement about guaranteed 4% interest as an oral agreement, it is clear from the record that Swanson was discussing the meaning of the share offering described in the Power Fund offering documents and not a separate contractual arrangement. (*See* Pl. Ex. E at 57–58; Bergeron Aff. ¶¶ 3–4).

18. Both parties rely on cases evaluating whether anti-reliance language in a written contract, by which the contracting parties promised that they did not rely upon statements outside the contract's four corners, was sufficiently clear to bar a party from reneging on its promise by claiming fraud in the inducement. *See, e.g., Kronenberg v. Katz,* 872

A.2d 568, 593 (Del.Ch.2004) (for a contract to bar fraud in the inducement claim, language must "add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract"); *Abry Partners v. F & W Acquisition LLC,* 891 A.2d 1032, 1059 (Del.Ch.2006) (murky or standard integration clauses without explicit anti-reliance language "will not relieve a party of its oral and extra-contractual fraudulent representations"). These cases are not on point. With respect to his breach of contract claims, Bergeron is not claiming that he was fraudulently induced to enter into the contract, and is not attempting

Finally, Bergeron points to the "Welcome Letter" he received after his Power V investment, which stated "[w]hile we are getting the Fund fully invested you will receive quarterly dividend payments.... Once the Fund is fully invested we will switch over to monthly dividends for [Power] V[.]" (DF ¶ 18). This post-contract letter does not alter the terms of the Offering Memorandum. Moreover, it does not obligate the Fund to make 4% payments. Similarly, the fact that some payments were made does not create a contractual obligation to continue to make the payments into the future. The undisputed facts do not establish a contractual obligation to make 4% payments.

### The IPO

 Bergeron claims that the Defendants' failure to establish a team or a plan for achieving an IPO, or to complete any of the work necessary to effectuate an IPO, constitutes a breach of the Power Fund Offering Memorandum. Specifically, Bergeron claims that the Defendants failed to comply with a provision in the Memorandum, which reads as follows:

> after the Trust's business is well-established, which is anticipated to be approximately three to seven years after this offering terminates, *the Trust will seek to make the Investor Shares more liquid.* Among the alternatives that might be available would be events ("Liquidity Events") such as a change in the Trust to create a publicly traded entity, either as the result of a business combination with other similar programs sponsored by the Managing Shareholder or by altering the existing securities, tax and organizational law limitations on transfer and trading of Investor Shares.

(Pl. Mem. at 32–33; Def. Ex. B at RW000021) (emphasis added). The Defendants argue that they are entitled to summary judgment on this claim because there is no evidence that Ridgewood did not, in fact, seek to make the Power Fund shares more liquid, and because the Offering Memorandum disclaimed any obligation to seek a liquidity event. (Def. Mem. at 37–38). This court finds that this issue is one for a jury.

The undisputed facts do establish, as the Defendants contend, that there was no guarantee that Ridgewood would go forward with an IPO or any other specific liquidity event. As the Offering Memorandum states:

> **No investor should purchase Investor Shares with the expectation that the Trust will elect to take or will be able to take any steps to make the Shares tradable on any market or that any other means of allowing an Investor to sell or "cash-out" his or her investment will be available.**

(Def. Ex. B at RW000022) (emphasis in original). However, contrary to the Defendant's characterization of his position, Bergeron is not claiming that the IPO was guaranteed. Rather, he is contending that, under the Power Fund Offering Memorandum, Ridgewood was obligated to at least "work towards a liquidity event." (*See* Pl. Opp. Mem. at 32). Further, he claims Ridgewood breached this obligation by doing nothing substantive in furtherance of its claim that it was planning for an IPO.

It should be for the jury to decide the scope of Ridgewood's obligations under the Offering Memorandum. These obligations are not clearly defined. Moreover, there is a conflict between the above-quoted pro-

to invalidate his contractual arrangements. Instead, he is claiming that the Defendants should be bound by oral statements that are

inconsistent with their obligations under the plain language of the written agreement.

vision relied on by Bergeron, which seems to obligate the Trust to at least "seek to make the Investor Shares more liquid," and the provision relied on by the Defendants, warning Investors that the Trust may not even "elect" to take steps to make the shares tradeable. "When there is uncertainty in the meaning and application of the terms of the contract," the court will "consider testimony pertaining to antecedent agreements, communications and other factors which bear on the proper interpretation of the contract." *Pellaton,* 592 A.2d at 478. Ridgewood's various statements over time evincing an intent to pursue an IPO, therefore, could support a jury finding that the Defendants were contractually obligated to seek liquidity.

Similarly, it should be for the jury to decide whether Ridgewood fulfilled its contractual obligations. It is the Defendants' position that "Plaintiff has supplied no evidence whatsoever that Ridgewood did not *seek* to make the Power Fund investments more liquid' within three to seven years following the Funds' closing. In fact, Ridgewood was seeking to improve the value of the companies through good management, and was exploring the market for IPOs and other alternatives." (Defs. Mem. at 37). However, as detailed above, Bergeron has submitted evidence to support a conclusion that despite Ridgewood's repeated representations that it was seeking a liquidity event in the form of an IPO, in reality it was doing nothing of substance to achieve that goal. Thus, the issue of Ridgewood's compliance with its contractual obligations vis-à-vis the IPO should be determined by a jury.

### Allocation of Investment Opportunities

■ Bergeron claims that "[b]y allocating Ridgewood's 'best' investment opportunities to later established funds and by giving away earlier Venture funds' follow-on investment rights to later established funds for no value" the Defendants breached the co-investment policy set forth in the Venture Fund Offering Memoranda. (Pl. Opp. Mem. at 33). Neither the language of the Offering Memoranda nor the facts concerning Ridgewood's decisions to allocate investment opportunities to new Funds rather than earlier Funds supports such a claim.

Under the express terms of the Offering Memoranda, Ridgewood agreed that it would generally allocate investment opportunities to the Fund that was first organized if, after consideration of a variety of factors and other conditions, there would be an equal benefit to each of the Funds that had money available for investment. (Def. Ex. C at RW000403–04). Even then, Ridgewood was only obligated to invest on behalf of the first organized Fund "to the extent of its funds that can be prudently invested in that opportunity." (*Id.* at RW000403). Accordingly, the Offering Memoranda gave Ridgewood broad discretion in making allocation decisions, and nothing therein required Ridgewood, unconditionally and without further consideration, to allocate investment opportunities to earlier Funds first.

Furthermore, the evidence illustrates that Ridgewood's allocation decisions were based on such considerations as the amount of funds available, the effects of further investment on a Fund's portfolio, and the level of risk that would be associated with further investment in a particular portfolio company. (*See* Pl.Ex. C at 85–90; Pl.Ex. J at RW001105 (10/22/99 letter)). Thus, the record establishes that Ridgewood's actions were consistent with the discretion provided to it under the terms of the Offering Memoranda. Therefore, this court recommends that the Defendants' motion for summary judgment be allowed with respect to this aspect of Bergeron's breach of contract claim.

*Investments in Seed–Stage Companies*

 Finally, Bergeron claims that Ridgewood breached the terms of the Venture Fund Offering Memoranda by investing in start-up, or seed-stage companies rather than in established companies. (Pl. Mem. at 33 n. 23). However, the relevant provision of the Memorandum creates no obligation on Ridgewood's part to invest only in established companies or to refrain from investing in start-up companies. Specifically, the language Bergeron relies on to support his claim provides only that "[t]he Fund will *prefer* making investments in companies with existing products that need capital to bring products to market or to expand, rather than in 'seed-stage' companies that are developing products, *but the Fund may invest in either type of company.*" (Def. Ex. C at RW000337) (emphasis added). This is consistent with the diversification provisions of the Offering Memorandum, pursuant to which Ridgewood agreed to attempt to limit the Funds' investments in very early stage companies, but emphasized that there could be no assurance that the Funds would or even could meet this objective. (*See* RW000355–56). Thus, there is no evidence that Ridgewood breached its contractual obligations with respect to the nature of its investments.[19]

### E. Count IV: Breach of Implied Covenant of Good Faith and Fair Dealing

In Count IV, Bergeron claims that the Defendants breached the implied covenant of good faith and fair dealing recognized under Delaware law. The Defendants contend that no such claim can lie in this case, and that they are entitled to judgment as a matter of law. This court recommends that the motion for summary judgment on this claim be denied with respect to the IPO claim for the reasons that follow.

 The implied covenant of good faith and fair dealing "is a judicial convention designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain." *Chamison v. HealthTrust, Inc.—Hosp. Co.*, 735 A.2d 912, 920 (Del. Ch.1999). As the court in *Chamison* described, the implied covenant

> requires the Court to extrapolate the spirit of the agreement from its express terms and based on that "spirit," determine the terms that the parties would have bargained for to govern the dispute had they foreseen the circumstances under which their dispute arose. The Court then implies the extrapolated term into the express agreement as an implied covenant and treats its breach as a breach of the contract.

*Id.* at 921.

Although Delaware courts will apply the legal theory only rarely, they will do so on occasions when, under the facts of a particular case, "issues of compelling fairness" make it necessary to imply such terms so

---

**19.** Because the language of the Offering Memorandum unambiguously left Ridgewood the option of investing in very early stage companies, Bergeron cannot rely on Gold's oral assurances that the Venture Funds would not invest in seed-stage or dot.com companies, or on other extrinsic evidence to support his breach of contract claim. *See MBIA Ins. Corp.*, 426 F.3d at 210 (where contractual language is unambiguous, extrinsic evidence may not be used to interpret parties' intent, vary the terms of the agreement or create an ambiguity). Moreover, by signing the Subscription Agreements for the Venture Funds, Bergeron specifically agreed that he was not relying on any oral statement made to him or written material given to him that was not otherwise contained in the Offering Memorandum. (Def. Ex. EE at RW000757; Def. Ex. FF at RW000783).

as "to honor the parties' reasonable expectations." *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del.1998). In such instances, "[t]he implied covenant cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract." *Chamison*, 735 A.2d at 921. Moreover, "where the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty to perform in good faith does not come into play." *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 24 (Del.Ch.1992).

 To the extent Bergeron can show that Ridgewood was contractually obligated to seek to make the shares in the Power Funds more liquid, he may also be able to show that Ridgewood breached an implied covenant of good faith and fair dealing. Although the Offering Memorandum did not dictate how Ridgewood was to seek to achieve liquidity, it is clear from the record that Ridgewood advised its investors that it was intending to proceed by way of an IPO. A jury may find that in doing so, Ridgewood was obligated by the spirit of the Offering Memorandum to perform in good faith by taking concrete steps toward achieving that goal. By using the prospect of an IPO to induce Bergeron to make repeated investments in its Funds, while failing to evaluate the feasibility of an IPO or to complete any significant tasks necessary to achieve an IPO, a jury could conclude that Ridgewood unfairly denied Bergeron the fruits of the parties' bargain. *See Merrill v. Crothall–American, Inc.*, 606 A.2d 96, 102 (Del.1992) (alle-

gation that defendant induced plaintiff to enter into at-will employment agreement by concealing from him its intention to employ him only temporarily and allowing him to proceed under belief that duration of employment would be indefinite stated valid claim for breach of implied covenant of good faith and fair dealing). Accordingly, the Defendants' motion should be denied with respect to the claims relating to the IPO in Count IV.[20]

### F. *Count V: Claim for Common Law Fraud and Deceit*

 In Count V of his Second Amended Complaint, the plaintiff alleges a claim for fraud and deceit. As in the case of his claim under the Securities Act, Bergeron relies on the Defendants' statements concerning the IPO and Swanson's promise of 4% interest payments to support his common law fraud claim. (*See* Pl. Mem. at 26). "In order to establish a claim of fraud, a plaintiff must show 'that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage.'" *Stolzoff v. Waste Sys. Int'l, Inc.*, 58 Mass.App.Ct. 747, 759, 792 N.E.2d 1031, 1041 (2003) (quoting *Danca v. Taunton Sav. Bank*, 385 Mass. 1, 8, 429 N.E.2d 1129, 1133 (1982)). The Defendants assert that they are entitled to summary judgment because Bergeron has failed to offer sufficient evidence to satisfy the elements of his claim. This court finds that disputed issues of fact concerning Ridgewood's statements about the Power Fund IPO and Swanson's statement concerning 4% interest payments warrant the

---

**20.** Because the record does not support any of Bergeron's other breach of contract claims, he cannot rely on the contractual provisions relating to those claims to support a breach of the implied covenant of good faith and fair dealing. *See Chamison*, 735 A.2d at 921 (the implied covenant "cannot be used to forge a new agreement beyond the scope of the written contract").

denial of summary judgment for the Defendants with respect to Count V.

### Falsity and Knowledge

■ The Defendants contend that the fraud claim must fail because Bergeron cannot point to evidence showing that Ridgewood's alleged representations were false at the time they were made or that Ridgewood had knowledge of their falsity. (Def. Mem. at 58–67). As described above with respect to Bergeron's allegations under the Securities Act, there is evidence in the record to support Bergeron's claim of falsity. In addition, the record supports the conclusion that Ridgewood had the requisite knowledge.[21] In particular, when viewed in Bergeron's favor, the evidence shows that Swanson promised Bergeron that he would receive guaranteed interest payments even though that promise conflicted with the Power Fund offering material and there was no apparent basis for such a statement. It also shows that Swanson represented that Ridgewood would have a Power Fund IPO in two or three years, even though Ridgewood had not evaluated whether an IPO was possible and had no plan in place for achieving such a goal. Thus, it could reasonably be inferred that Swanson knowingly misrepresented Ridgewood's payment obligations and the feasibility of achieving an IPO.

Additionally, the evidence detailed above shows that beginning in 1997 and throughout much of the relevant time period, Ridgewood made statements to the effect that it was planning an IPO and that there was a reasonable prospect that an IPO would take place. When the record is

viewed in Bergeron's favor, a jury could conclude that the Defendants knew that those statements were false. More specifically, the fact that the Defendants made the challenged statements, despite knowing that no feasibility study had been conducted and that little if any work had been done, supports an inference of knowledge. *See Cummings v. HPG Int'l, Inc.,* 244 F.3d 16, 23 (1st Cir.2001) ("Knowledge" for the purpose of showing fraud may be established by evidence that the speaker " 'knows that he does not have the basis for his representation that he states or implies.' ") (quoting Restatement (Second) of Torts § 526).

Even if the Defendants did not know at the outset that an IPO was unrealistic, there is ample evidence to show that while Ridgewood was continuing to tell its investors that an IPO was forthcoming, the Defendants learned that no such result was possible. The record demonstrates that as date of the IPO grew nearer, it became clear that DLJ would not be acting as an advisor, that Ridgewood would not be able to accomplish the major tasks necessary to achieve an IPO, and that Ridgewood did not have anything close to the earnings necessary for an IPO to be viable. (Pl.Ex. A at 122–24, PF ¶¶ 78–9, 88, 91). The fact that Ridgewood continued to tell its investors that it was planning to accomplish an IPO in 2001, despite all of the evidence to the contrary, would support a jury concluding that Ridgewood was lying.

### Material Facts

■ Next, the Defendants contend that their representations cannot be con-

---

**21.** The Defendants contend that Bergeron "disavowed" his fraud claims arising from his investments in the Power Funds. (Def. Mem. at 56–58). In particular, the Defendants argue that Bergeron's sworn testimony was inconsistent with prior discovery responses regarding the factual basis for his claims. The summary judgment record makes clear what Bergeron asserts as the basis for his claims. To the extent there are inconsistencies between his testimony and any admissions or other sworn discovery responses, the Defendants are free to point out those inconsistencies at trial.

strued as "material facts" because they were "nothing more than non-actionable opinions, projections, expectations, beliefs, hopes, statements of potential, promises, and 'puffery.'" (Def. Mem. at 68). However, for purposes of common law fraud claims, "[u]nder Massachusetts law, '[a] statement of a promissory or predictive nature is actionable [in fraud] if it can be shown that the maker never intended to carry out the promise or knew that the prediction was false when it was made.'" *Pearce v. Duchesneau Group, Inc.*, 392 F.Supp.2d 63, 74 (D.Mass.2005). As detailed above, the record supports an inference that Swanson's promise of interest payments was knowingly false when made. Furthermore, in light of the evidence that Ridgewood had no concrete plans for and no realistic prospect of achieving an IPO, its statements to the effect that Ridgewood was planning for and expecting to conduct a public offering remain actionable.

■■■■ Moreover, "a statement of opinion may be actionable where the speaker possesses superior knowledge concerning the subject matter to which the misrepresentations relate, or where the opinion is 'reasonably interpreted by the recipient to imply that the speaker knows facts that justify the opinion.'" *Stolzoff,* 58 Mass.App.Ct. at 760, 792 N.E.2d at 1041. To the extent Ridgewood's representations regarding the IPO were merely expressions of opinion, Ridgewood had superior knowledge as to whether such an event was reasonably likely to occur. Furthermore, under the circumstances presented, a jury could find that it was reasonable for Bergeron to conclude that Ridgewood's representations were supported by underlying facts concerning the prospect of an IPO and the work that had been completed to reach that end.

### Reliance

■■■ Finally, the Defendants assert that Bergeron cannot meet the reliance element of his common law fraud claim because he cannot substantiate that he actually read or heard each of the alleged misrepresentations prior to making his investments and because his reliance on those statements was unreasonable as a matter of law. For the reasons that follow, this court finds that the issue of reliance is a question of fact for the jury.

When the evidence is viewed in the plaintiff's favor, it cannot seriously be disputed that Bergeron read or heard at least some of the alleged misrepresentations before investing in each of the Ridgewood Funds. The investments at issue occurred between January 23, 1998 and January 7, 2002. (DF ¶¶ 24, 126). Bergeron claims that his decision to invest in each of the Power Funds was based partially on Swanson's promise of guaranteed 4% payments, and that his decisions to invest in both the Power Funds and the Venture Funds were based in part upon representations regarding the Power Fund IPO. (PF ¶¶ 16–17, 53, 105). Indeed, the record indicates that before he invested in any of the Funds, Bergeron had a conversation with Swanson in which Swanson promised interest payments and stated that the Power Trust V Fund would achieve an IPO in two or three years. (Bergeron Aff. ¶¶ 3–4). Bergeron claims that Swanson's representations were false. (*See id.* ¶ 20). Thereafter, Swanson sent numerous letters to Ridgewood investors in which he discussed the upcoming Power IPO. (*See* PF ¶ 29). Bergeron claims that those representations also were false. (Bergeron Aff. ¶¶ 13, 20). Many of those letters were sent well before the plaintiff had completed his investments in the Ridgewood Funds. (*See* Pl.Ex. I). Bergeron read each of the letters he received and trusted

the information contained therein. (Bergeron Aff. ¶ 13). Therefore, Bergeron has shown that he relied on alleged misrepresentations in making his investment decisions.

The Defendants nevertheless argue that Bergeron's reliance must be deemed unreasonable as a matter of law because the alleged misrepresentations conflicted with the written statements made in the offering materials and with Bergeron's own knowledge and understanding. (Def. Mem. at 76–93). Ordinarily, the reasonableness of a plaintiff's reliance is a question of fact. *See Collins v. Huculak*, 57 Mass.App.Ct. 387, 392, 783 N.E.2d 834, 839 (2003) ("the question, whether the plaintiff exercised due diligence and was justified in placing confidence in the statement of the defendant or should have known from the beginning that [the statement was false], is one of fact") (quotations and citation omitted). However, under certain circumstances, an investor's reliance may be deemed unreasonable as a matter of law where the investor closed his eyes and passively accepted contradictions between the defendant's statements and the offering memorandum. *See Kennedy v. Josephthal & Co., Inc.*, 814 F.2d 798, 805 (1st Cir.1987) (plaintiff investors' reliance on broker's statements unreasonable as a matter of law where broker's statements were directly refuted by plain language of offering memorandum and plaintiffs made no effort to resolve contradictions); *Marram*, 442 Mass. at 59, 809 N.E.2d at 1031 ("in some circumstances a plaintiff's reliance on oral statements in light of contrary written statements is unreasonable as a matter of law").[22] Nevertheless, under the circumstances presented here, this court finds that the reasonableness of Bergeron's reliance remains an issue of fact for trial.

In the instant matter, Bergeron has shown that the alleged statements regarding the IPO were not contradicted by unambiguous language in the Offering Memorandum. As described above with respect to the plaintiff's breach of contract claim, a jury can find that the Offering Memorandum provided that the Defendants would seek to make investor shares more liquid. The Defendants' representations to the effect that they were intending to achieve and planning for an IPO were entirely consistent with that provision. Therefore, Bergeron's reliance on those statements cannot be deemed unreasonable as a matter of law.

The fact that the offering documents contained myriad warnings as to the risk of investing, and that Bergeron was a sophisticated investor who should have understood those risks, does not compel a different result. The plaintiff does not claim that Ridgewood made assurances that an IPO would take place. His claim is that Ridgewood fraudulently led him to believe that it was taking affirmative steps toward an IPO when it was doing little if anything to achieve that goal and was aware of facts which indicated that an IPO would not be feasible. There is no evidence to suggest that the plaintiff knew or should have known that Ridgewood's representations were untrue. Therefore, this court concludes that the reasonableness of Bergeron's reliance on statements con-

---

**22.** The case law suggests that where the parties have a fiduciary relationship, there is a heightened duty to make honest disclosures. *See Collins*, 57 Mass.App.Ct. at 394, 783 N.E.2d at 841 (concluding that plaintiffs' reliance on false statements by plaintiffs' father was not justified under the circumstances, but noting that "the case would stand on different footing were there a fiduciary or other similar relationship of trust and confidence between the father and the [adult] plaintiffs") (internal quotations omitted).

cerning the IPO is an issue of fact for the jury.

This court also finds that there are genuine issues of disputed fact as to the reasonableness of Bergeron's reliance on the promise of guaranteed 4% payments. Although Swanson's oral representation was contradicted by the unambiguous language of the offering documents, it is undisputed that following Bergeron's investment in the Power Trust V Fund, but prior to his investment in the Power Growth Fund, Bergeron received a "welcome letter" in which Ridgewood stated that it would be making dividend payments. (Pl.Ex. I at RW002668 (2/11/98 letter)). It is also undisputed that Bergeron received quarterly dividend payments of 1% beginning in April 1998. (*See* Pl.Ex. I at RW002661 (4/28/98 letter enclosing payment); *see also* RW002644 (7/28/98 letter enclosing payment); RW002626 (10/27/98 letter enclosing payment)). It is unclear on the record before this court whether Bergeron understood at the time he received those payments that Ridgewood's use of the word "dividends" to describe the payments was inconsistent with Swanson's oral promise of interest payments. Thus, a jury could find that, notwithstanding the language of the offering documents, Ridgewood's actions were consistent with Swanson's oral promise, and that therefore, Bergeron's reliance on that promise was reasonable, at least with respect to his investment in the Power Growth Fund in December 1998. Consequently, this court finds that the Defendants are not entitled to summary judgment on Bergeron's claim for common law fraud.

### G. *Count VI: Claim for Negligent Misrepresentation*

Bergeron also claims that the Defendants are liable for negligent misrepresentation, and that the facts supporting his fraud claim likewise support this claim. (Pl. Opp. Mem. at 29). To prove his claim, Bergeron must demonstrate

> that the defendant: (1) in the course of its business, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) that it failed to exercise reasonable care or competence in obtaining or communicating the information.

*Cummings*, 244 F.3d at 24. The Defendants are seeking summary judgment on the grounds that the alleged misrepresentations are not false or otherwise constitute non-actionable opinions, expectations, plans or projections, and that the plaintiff's reliance on the alleged misrepresentations was unreasonable. For the reasons discussed above with respect to the plaintiff's claim for fraud and deceit, this court recommends that the motion for summary judgment on Count VI be denied as well.

### H. *Count VII: Claim for Unfair and Deceptive Trade Practices*

In Count VII of his Second Amended Complaint, Bergeron alleges that the Defendants' conduct constituted unfair and deceptive trade practices in violation of Mass. Gen. Laws ch. 93A ("Chapter 93A"). The Defendants contend that this claim must fail for two reasons. First, they assert that the Bergeron's inability to maintain claims for fraud and negligent misrepresentation warrants the dismissal of his claim under Chapter 93A as well. (Def. Mem. at 95). However, as detailed above, the Defendants have failed to establish that they are entitled to summary judgment on those claims. Accordingly, this argument is unpersuasive. *See Nota Constr. Corp. v. Keyes Assocs., Inc.*, 45 Mass.App.Ct. 15, 21, 694 N.E.2d 401, 406 (1998) (where defendants' representations "set forth potentially viable claims for de-

ceit and negligent misrepresentation, [plaintiff's] c. 93A claim based on those representations remains viable"). Second, the Defendants contend that their conduct is not actionable under Chapter 93A because the securities at issue were private in nature. (Def. Mem. at 96). For the reasons that follow, this argument fails as well.

■ It is beyond question that chapter 93A applies to the sale of securities. Admittedly, when originally enacted, chapter 93A was not intended to regulate the field of securities transactions. *Barron v. Fidelity Magellan Fund,* 57 Mass.App.Ct. 507, 512, 784 N.E.2d 634, 639 (2003). However, in 1988, "the statute was amended to apply to circumstances involving 'any security.'" *Id.*

In the instant case, Ridgewood issued Offering Memoranda and sought investors from the general public, albeit within a specific economic range. This is sufficiently public in nature to render the transaction a consumer transaction governed by Chapter 93A. *See KPS & Assoc., Inc. v. Designs by FMC, Inc.,* 318 F.3d 1, 24 (1st Cir.2003) (arms-length business transaction between unrelated parties comes within scope of Chapter 93A). Therefore, the motion for summary judgment as to this Count should be denied.

## I. *Statute of Limitations*

■ In addition to challenging each of the plaintiff's claims on the merits, the Defendants contend that the claims are barred by the applicable statutes of limitations. This court finds that there are questions of fact as to when each cause of action began to accrue. Therefore, the

Defendants have not demonstrated that the claims are untimely as a matter of law.

## *Contract Claims*

Bergeron filed this lawsuit in December 2005. (Def. Mem. at 96; Pl. Opp. Mem. at 42). As the parties agree, Bergeron's claims for breach of contract and breach of the implied covenant of good faith and fair dealing are subject to a three year statute of limitations under Delaware law. *See* 10 Del. C. § 8106. Therefore, for Bergeron's contract claims to be timely, they must have accrued after December 2002.

Generally, the cause of action accrues "when there has been a harmful act by a defendant. This is true even if the plaintiff is unaware of the cause of action or the harm." *In re Tyson Foods, Inc. Consol. S'holder Litig.,* 919 A.2d 563, 584 (Del.Ch. 2007). However, under Delaware law, the statute of limitations may be tolled and the court may consider an otherwise stale claim where "a plaintiff has reasonably relied upon the competence and good faith of a fiduciary." *Id.* at 585.[23] Under such circumstances, "no evidence of actual concealment is necessary . . . but the statute is only tolled until the [plaintiff] 'knew or had reason to know of the facts constituting the wrong.'" *Id.* (quoting *In re Dean Witter P'ship Litig.,* 1998 WL 442456, at *6 (Del.Ch. July 17, 1998)). "[A] plaintiff bears the burden of showing that the statute was tolled," and "no theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong." *Id.*

In the instant case, there is evidence from which a jury could find that Bergeron

---

23. Delaware law also provides for tolling of the limitations period "when a defendant has fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth. Under this doctrine, a plaintiff must allege an affirmative act of 'actual artifice' by the defendant that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth." *In re Tyson Foods Consol. S'holder Litig.,* 919 A.2d at 585.

was not put on notice with respect to his contract-based claims until April 2003.[24] At that time, Bergeron understood, based on a letter that Ridgewood sent to its shareholders, that there would be no Power Fund IPO. (PF ¶¶ 83–84). He also agrees that at some point after receiving the letter, he realized that there was a significant problem. (PF ¶ 85). Prior to that time, Ridgewood consistently represented that it was pursuing its goal of holding an IPO and achieving liquidity. (*See, e.g.,* Pl.Ex. I at RW002961–62 (2/14/02 letter confirming Ridgewood's goal of providing liquidity)). Therefore, the record supports a conclusion that the contract-based claims were timely.

The Defendants argue that by the end of 2001, Bergeron had knowledge of all facts giving rise to his allegations for breach of contract. (Def. Mem. at 43–44). In particular, they point to testimony in which Bergeron admitted that Ridgewood's expressions of gloominess in the IPO market in March 2001 rang true, and that adverse conditions that were occurring in the power industry at the time were impacting the potential for an IPO. (*See* DF ¶ 77; Def. Ex. I at 166, 219). While Bergeron may have been aware of conditions in the market, such knowledge would not have led to a suspicion that Ridgewood had been avoiding a contractual obligation to seek liquidity. Moreover, despite the climate in the power industry by 2001, Ridgewood continued to represent to its investors that it was taking steps toward its goal of an IPO. (*See* Pl.Ex. I at RW002703 (9/27/01 letter confirming that Ridgewood was continuing to prepare for the merger of the Power Trusts)). Therefore, this court con-

cludes that the question whether Bergeron knew or should have known, at any time prior to 2003, facts suggesting that Ridgewood was lying about its efforts to achieve an IPO is an issue of fact to be decided at trial.

### Remaining Claims

The plaintiff's statutory claims, including his claims under the Securities Act and Chapter 93A, are subject to a four year statute of limitations, while the limitations period for the plaintiff's fraud and misrepresentation claims is three years. *See* Mass. Gen. Law ch. 110A, § 410(e); Mass. Gen. Laws ch. 260, §§ 2A, 5A. Bergeron contends that under principles of equitable tolling, none of these causes of action accrued before 2003, when he was first put on notice that something was wrong. (*See* Pl. Opp. Mem. at 38–40). For the reasons that follow, this court finds that there is a disputed issue of fact as to whether any of these claims accrued prior to 2003.

■ "In Massachusetts, a plaintiff can prove that the running of the statute of limitations has been tolled by invoking one of two interrelated doctrines: (1) the 'discovery rule;' and (2) the doctrine of fraudulent concealment." *Kravetz v. U.S. Trust Co.,* 941 F.Supp. 1295, 1302 (D.Mass.1996). Under the discovery rule, the limitations period begins to run "when the injured party knew or, in the exercise of reasonable diligence, should have known, the factual basis for the cause of action. The standard set forth is an objective one. The action accrues when the injured party reasonably should have known the factual basis for the cause of action." *Id.* at 1303 (quoting *Tagliente v. Himmer,* 949 F.2d 1, 4 (1st Cir.1991)) (internal quotations omitted).

---

24. Because this court has concluded that the Defendants are entitled to summary judgment on the merits of all of Bergeron's breach of contract and breach of implied covenant of good faith and fair dealing claims except for those arising out of Ridgewood's alleged failure to seek liquidity, this court's statute of limitations contract analysis is confined to the surviving claims.

■ Fraudulent concealment tolls the statute of limitations where "the wrongdoer either concealed the existence of a cause of action through some affirmative action done with intent to deceive *or* breached a fiduciary duty of full disclosure." *Id.* (quotations and citations omitted). However, the limitations period will begin to run if "the plaintiff, through reasonable diligence, discovered or should have discovered the fraud." *Kennedy,* 814 F.2d at 802. In the context of securities fraud actions, the courts have "characterized the facts that trigger inquiry notice as 'sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved in the sale.'" *Id.* (quoting *Cook v. Avien, Inc.,* 573 F.2d 685, 697 (1st Cir.1978)). *See also Marram,* 442 Mass. at 54 n. 20, 809 N.E.2d at 1027 n. 20 ("The plaintiff is on inquiry notice from the time a reasonable investor would have noticed that something was 'amiss'"). "Once on notice, the investor is then under a duty to exercise due diligence in making a further investigation into those facts." *Kravetz,* 941 F.Supp. at 1303 (quotations and citation omitted).

For the same reasons articulated above with respect to the plaintiff's contract-based claims, this court finds that there is an issue of fact as to whether Bergeron reasonably should have known that something was amiss, at any time prior to 2003, with respect to the Defendants' representations concerning the IPO. Therefore, to the extent Bergeron's surviving claims are based on such statements, they should not be barred by the statute of limitations. To the extent his claims are based on Swanson's oral promise of 4% interest payments, this court finds that disputed issues of fact as to when those claims accrued similarly preclude summary judgment in the Defendants' favor.

The Defendants contend that the plaintiff's claims based on the alleged promise of guaranteed payments accrued in 2001, when Bergeron received Ridgewood's January 30, 2001 letter announcing the suspension of quarterly dividend payments. (Def. Mem. at 99). Bergeron testified that when he received the letter, he believed that Ridgewood had breached an agreement to make guaranteed interest payments. (Def. Ex. I at 156). The Defendants argue that this was enough to show that in 2001, Bergeron was put on inquiry notice of his claims based on fraud and misrepresentation. (Def. Mem. at 99). This court disagrees. While Bergeron's testimony suggests that he may have been on notice of any potential breach of contract claim as of 2001, there is nothing in Ridgewood's letter that would have alerted a reasonable person "to the possibility that there were either misleading statements or significant omissions involved in the sale." *Kennedy,* 814 F.2d at 802.

In its January 30, 2001 letter, Ridgewood explained that it was "suspending" dividends in order to strengthen the Power Funds in preparation for a possible IPO, and due to a temporary interruption in the cash flow from power plants owned by certain of the Funds. (Pl.Ex. I at RW002766). It also assured investors that if it was not able to effectuate the IPO, it would "make a catch up dividend a year from now." (*Id.* at RW002767). A reasonable investor could view these representations as entirely consistent with the promise of guaranteed payments. Therefore, a question of fact remains as to whether Bergeron's claims based on fraud and misrepresentation accrued at any time prior to 2003.

## IV. CONCLUSION

For all of the reasons detailed above, this court recommends to the District

Judge to whom this case is assigned that the "Defendants' Motion for Summary Judgment" (Docket No. 79) be AL-LOWED IN PART and DENIED IN PART.[25] Specifically, this court recommends that the motion be DENIED as to Count I; ALLOWED as to Count II; DENIED as to the claims relating to the IPO in Counts III and IV, but otherwise AL-LOWED as to Counts III and IV; and DENIED as to Counts V, VI and VII of the Second Amended Complaint.

25. The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. *See*

*Keating v. Sec'y of Health & Human Servs.,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604–605 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376, 378–79 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *see also Thomas v. Arn,* 474 U.S. 140, 153–54, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985). *Accord Phinney v. Wentworth Douglas Hosp.,* 199 F.3d 1, 3–4 (1st Cir.1999); *Henley Drilling Co. v. McGee,* 36 F.3d 143, 150–51 (1st Cir.1994); *Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1, 4 (1st Cir. 1998).