**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3316-17T3

IN THE MATTER OF SAMUEL
K. BURLUM and EXTREME
ENERGY SOLUTIONS, INC.

_____

Submitted September 9, 2019 – Decided September 20, 2019

Before Judges Fasciale and Rothstadt.

On appeal from the Department of Law and Public Safety, Division of Consumer Affairs.

Janet S. Del Gaizo, attorney for appellants Samuel K. Burlum and Extreme Energy Solutions, Inc.

Gurbir S. Grewal, Attorney General, attorney for respondent New Jersey Bureau of Securities (Brian F. McDonough, Assistant Attorney General, of counsel; Isabella Trifilio Stempler, Deputy Attorney General, on the brief).

PER CURIAM

Samuel K. Burlum and Extreme Energy Solutions, Inc. (EES) (collectively defendants) appeal from a January 18, 2018 Final Decision by the Chief of the New Jersey Bureau of Securities (the Bureau or the Bureau Chief),

concluding that defendants violated the New Jersey Uniform Securities Law, N.J.S.A. 49:3-47 to -83 (the Securities Law). The Bureau determined that defendants violated the Securities Law by "selling unregistered securities, acting as an unregistered agent, employing unregistered agents, and making untrue statements of material facts and omitting material facts necessary in order to make the statements they made not misleading." The Bureau Chief imposed $1,125,000 in penalties. We affirm.

I.

In 2009, Jack Wagenti and his associates formed ECO Green, Inc. (ECO Green), and Burlum started Extreme Energy Solutions, LLC (the LLC). On November 1, 2010, Burlum and his partners merged the LLC with ECO Green and filed the documents required to change the name of the merged company to EES. Burlum was appointed Chairman of the Board of Directors (the BOD) and CEO of EES; he was responsible for the company's day-to-day operations, which were subject to oversight by the BOD.

In May 2011, Wagenti and his associates resigned after Wagenti accused Burlum of concealing his arrest record, which Burlum claims he disclosed. But prior to resigning, Wagenti had drafted a Private Placement Memorandum (the PPM), to raise funds through investor contributions. The BOD approved the

PPM, which was sent to existing investors and Wagenti's personal contacts. Thereafter, new investors were obtained through word-of-mouth from existing investors.

The PPM was not sent to the general public. The PPM explained that there is no public market for the investment, that there are no assurances that a public market will ever exist, and that the investment is high-risk. Furthermore, it stated that the investment was not registered with the Securities Exchange Commission (SEC) or any state securities commission and that it is being offered under the Regulation D (Reg-D) exemption.

The PPM included a subscription agreement and an investor questionnaire to ensure that the investor is accredited, which included a declaration that the investor has knowledge and experience in making his or her own investment decisions. Any party seeking to invest also had to sign a statement indicating that he or she relied: only upon the information in the PPM; had sufficient assets; had a net worth or gross income as stated in the questionnaire; could bear the economic risk of losing the entire investment; had the opportunity to ask questions and obtain information; had substantial experience in making investments and evaluating risk; and understood that the offering was not registered.

3

The PPM resulted in thirteen new individual accredited investors and funds totaling $62,500, which was deposited into corporate accounts. A second PPM was terminated in February 2012 and resulted in forty-two individual accredited investors, raising $252,500, which was also deposited into corporate accounts. A third PPM terminated in April 2012 and resulted in 120 investments, raising $695,000, which was also placed into corporate accounts. And a fourth PPM terminated in August 2012 and resulted in fifty-two investments totaling $885,000, which was placed into corporate accounts.

Burlum was also a member of the Global Information Network (GIN), a networking organization. The Bureau claims that Burlum solicited and preyed upon GIN members to invest in EES. In April 2012, Burlum attended a GIN event in Las Vegas, Nevada, and after the event was over, EES held an investor update meeting in the same facility. The meeting was by invitation only. Mitesh Patel, who was a GIN member, attended the investor meeting after having been introduced to EES by Nermin Ucar, another investor who was married to Burlum. Patel had previously invested $25,000 into EES. After the meeting, Patel emailed his list of GIN contacts about EES and presented them with the opportunity to invest in the company. After he received interest, he sent a

second email with the PPM attached and with passcodes for access to investor conference calls.

Eventually Patel received too many responses so he sought assistance from Jeff Smith, EES's Director of Sales and Marketing and a fellow GIN member. In response to new potential investors' questions about how to fill out the accredited investor form, Smith created video instructions. Burlum heard that Smith created the video, but neither Burlum nor EES saw the video or had access to it. EES paid Patel ten percent of total investments received because of his efforts, even though EES and Patel never entered into any commission agreement. At some point, one or more GIN members that Patel contacted forwarded his email to their own contact lists.

In September 2012, the Bureau instructed defendants to "immediately cease the offering and sale of unregistered securities while the Bureau's investigation [was] pending." But, in April 2013, EES sent investors a document entitled "Call to Action," encouraging all 225 existing investors to invest a minimum of $2,500 with a yield of ten percent per year. Thirty-four loans were made to EES (collectively EES Notes), totaling $796,600. In August 2014, defendants requested that "each and every" one of EES's approximately 225 investors invest in the EES Notes for "capital."

In September 2014, the then Bureau Chief issued a Summary Order and Cease and Desist Order (the Cease and Desist) against EES and Burlum. According to the Bureau, from March 2011 through August 2014 (the relevant period), Burlum and EES raised approximately $2,012,500 from the sale of unregistered EES stock and warrants through the PPMs (collectively EES Securities). With the addition of the EES Notes, defendants raised approximately $2,809,100. EES allegedly used at least fourteen unregistered agents – including Burlum and GIN members like Patel – to offer and sell the EES Securities. The Cease and Desist also accused Burlum of making materially false and misleading statements and/or omissions of material facts in violation of N.J.S.A. 49:3-52(b). The Bureau asserted that this occurred both in emails and orally during EES Investor Conference Calls. Further, it claimed that these false statements included both that an S-1 registration form[1] was filed with the SEC, and that EES was going to conduct an initial public offering (IPO) of its stock by the end of 2012.

In September 2017, an administrative law judge (ALJ) issued an Initial Decision granting summary decision in favor of the Bureau and determined that

---

[1] An S-1 is a general registration statement for all companies that must be filed with the SEC to begin the process of going public.

defendants: (1) were not registered with the Bureau; (2) sold unregistered securities; and (3) employed unregistered agents. She also found that Burlum's misrepresentations were material because they were made to investors who wanted to ask questions about the financial health of EES prior to investing. The current Bureau Chief then rendered the Final Decision accepting the ALJ's Initial Decision, but modifying it to apply a strict liability standard to defendants' conduct.

II.

Defendants contend that there was a genuine dispute as to a material fact, so summary decision should not have been granted. "An administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." In re Herrmann, 192 N.J. 19, 27-28 (2007). An appellate court determines

> whether the findings made could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole, with due regard to the opportunity of the one who heard the witnesses to judge of their credibility . . . and . . . with due regard also to the agency's expertise where such expertise is a pertinent factor.
>
> [Mayflower Sec. Co. v. Bureau of Sec., Div. of Consumer Affairs, 64 N.J. 85, 92-93 (1973) (alterations

7

in original) (internal quotation marks and citation omitted).]

A party is entitled to summary decision if "there is no genuine issue as to any material fact challenged[.]" N.J.A.C. 1:1-12.5(b). When reviewing a grant of summary decision, we use the same standard of review as an order granting summary judgment, which is de novo. N.J. Div. of Taxation v. Selective Ins. Co. of Am., 399 N.J. Super. 315, 322 (App. Div. 2008). We consider the facts in a light most favorable to the non-moving party. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995). "An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." R. 4:46-2(c). If there is no genuine issue of material fact, the question is then "whether the trial [judge] correctly interpreted the law." DepoLink Court Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013).

Burlum told investors that an S-1 was filed. The ALJ found that Burlum knew that this statement was false when he made it. EES and Burlum admitted that Burlum made the statement and that there may have been potential investors on the call, even though he claimed that the call was directed toward existing

investors. Wagenti's certification stated that, "[a]t no time during [his] tenure on the EES [BOD] did [he] file a Form S-1 on behalf of EES with the [SEC]." Burlum claimed that this does not contradict his earlier statements, as he testified that Wagenti told him about the S-1 filing during the merger negotiations, before the EES BOD was even created. Wagenti also certified that, "[a]t no time during [his] tenure on the EES [BOD] did [he] tell Mr. Burlum that [he] filed a Form S-1 on behalf of EES with the SEC." At his deposition, Burlum testified that he believed that Wagenti filed a signed S-1. He said that he never saw a completed S-1 for ECO Green, but he saw the first page of an application. Burlum's May 1, 2012 statement is the only statement that the ALJ found was "knowingly false," "material," and "recklessly made." Consequently, there was no genuine issue of material fact.

We conclude the Bureau Chief properly adopted the ALJ's findings and conclusion to grant a summary decision. Because an administrative agency's final decision will be upheld absent "a clear showing that it is arbitrary, capricious, or unreasonable," or lacks support in the record, there is no basis to overturn the summary decision. Herrmann, 192 N.J. at 27-28. The ALJ found that Burlum made a false statement regarding the filing of an S-1 form, and this provided part of the basis for granting decision in favor of the Bureau. Because

9

there was no showing that this was arbitrary, capricious, unreasonable, or without support in the record, summary decision was appropriate.

## III.

Defendants argue that the Bureau Chief's refusal to provide EES with an exemption constitutes an abuse of discretion. The Securities Law protects investors by requiring that securities be registered with the Bureau unless they are exempt from registration, registered under the Securities Law, or federally covered. N.J.S.A. 49:3-60. Intent is not mentioned under N.J.S.A. 49:3-60.

Issuers who want to offer and sell securities without registering the offering with the SEC must comply with the requirements of Reg-D under 17 C.F.R. §§ 230.504 and 230.506. A Form D, which signifies exemption, must be filed with the SEC on its public database, no later than fifteen days after the first sale of the securities. Id. at § 230.503. Here, the only Form D in the record pertained to ECO Green, which cannot provide Burlum or EES a safe harbor from registering the EES Securities. Moreover, this filing only pertained to ECO Green's stock and did not include options or debt, such as the EES units.

Defendants assert that the offerings were covered by the issuer exemption contained in 17 C.F.R. §§ 230.501 to 230.506. The Uniform Securities Act (the Act) provides exemptions from registration where the issuer satisfies all

10

conditions set forth in 17 C.F.R. §§ 230.501 and 230.502. See id. at § 230.506(b). An issuer is "every person who issues or proposes to issue any security[.]" 15 U.S.C. § 77b(a)(4). The issuer is further required to take reasonable steps to verify that the securities sold in any offering are made to accredited investors. 17 C.F.R. § 230.506(c). But, for those purchases made before September 23, 2013, a certification by the investor indicating that he or she was an accredited investor at the time of the sale satisfies the issuer's reasonable verification requirement. Id. at § 230.506(c)(2)(D).

The Form D exemption does not extend to offerings made "by any form of general solicitation or general advertising[.]" Id. at § 230.502(c). In addition, the offeree cannot conduct a "seminar or meeting whose attendees have been invited by any general solicitation or general advertising[.]" Id. at § 230.502(c)(2). Here, EES denies advertising the offering, sending out general solicitations, and/or holding meetings in which the general public was invited. It claims that the investor update was only for existing investors.

The Act also mandates that there must be a legend on the certificate stating "that the securities have not been registered under the Act and, therefore, cannot be resold unless they are registered under the Act or unless an exemption from registration is available[.]" Id. at § 230.502(d)(2) to (3). These actions "will

11

establish the requisite reasonable care[.]" Id. at § 230.502(d). Defendants argue that the PPMs are in conformance with these requirements. Finally, the Act requires that the issuer file a Form D within fifteen days of the first sale. Id. at. § 230.503.

"[T]he burden of proving an exemption or an exception from a definition is upon the person claiming it." N.J.S.A. 49:3-50(d). Here, defendants raised over $2 million from the sale of EES stocks and notes, the agents who sold the securities were not registered with the Bureau, and defendants approved the content of the PPMs and EES Notes. Defendants have failed to proffer material facts establishing that an exemption applies. As a result, the Bureau Chief did not abuse his discretion in concluding that an exemption did not apply to defendants. Defendants could not show that they complied with the statutory exemption requirements.

## IV.

Defendants assert that the Bureau did not demonstrate that the alleged false statements were material under Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-54 (1972). N.J.S.A. 49:3-52(b) prohibits, in connection with the offer, sale, or purchase of any security, the making of "any untrue statement of a material fact or to omit to state a material fact necessary

12

in order to make the statements made, in the light of the circumstances under which they are made, not misleading[.]"  In cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." Affiliated, 406 U.S. at 153-54.  "[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information." Basic Inc. v. Levinson, 485 U.S. 224, 240 (1988).  Here, the ALJ stated that, "[w]hile materiality is generally an issue of fact, it can be decided as an issue of law when the statements made are so clear that reasonable minds could not differ."  But defendants claim that "the mere existence of a filed S-1 is only proof of the intention to go public, and . . . is a forward[-]looking statement."

Defendants claim that the PPMs contained "warning language" that the investment had not been registered, and that the securities had not been approved by the SEC or any State securities commission.  Defendants designated the investment as "Extremely High Risk[]" and that it is "highly speculative" and possible for an investor to "lose all or part" of the invested funds.

But, the Bureau contends that it was able to obtain information on the EES Investor Conference Calls from EES's website.  It also states that defendants

sent an email to a prospective investor and stated that an S-1 was filed. During a March 2012 EES Investor Conference Call, Burlum stated that an investment bank was handling the EES IPO, but he did not mention that EES owed that bank thousands of dollars and that the bank refused to proceed until all issues were resolved. And one month later, on an April 2012 telephone call, Burlum stated that the S-1 was filed and that EES would be publicly traded within six to nine months.

The ALJ concluded that the statements were false. First, there was no S-1 statement on file with the SEC for an EES Securities offering either when the statements were made or at any time during the relevant period. Second, there were not any arrangements for the investment bank to take EES public. Next, the ALJ concluded that these false statements were material. She stated that, "[t]hese admitted statements were made by Burlum during an EES conference call for investors who wanted to ask questions about the financial health of EES prior to investing, and some of these individuals invested subsequent to the conference call." Misrepresentations that an issuer is planning to conduct an IPO are material. See SEC v. CKB168 Holdings, Ltd., 210 F. Supp. 3d 421, 444-45 (E.D.N.Y. 2016). Courts have also rejected the notion that statements

14

of planning for an IPO are mere puffery. See Bergeron v. Ridgewood Sec. Corp., 610 F. Supp. 2d 113, 134 (D. Mass. 2009).

"Under the 'bespeaks caution' doctrine, 'cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.'" EP Medsystems, Inc. v. Echocath, Inc., 235 F.3d 865, 873 (3d Cir. 2000) (quoting In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 371 (3d Cir. 1993)). But this doctrine only applies to forward-looking statements, and not those of present fact. Id. at 874. "[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." Id. at 873 (alteration in original) (quoting Trump, 7 F.3d at 371-72). Thus, the PPMs with their "warning language" that the investment was "extremely high risk" do not provide sufficient insulation for defendants.

As the filing of an S-1 and the assurances of an IPO would be important to a reasonable investor, they were aptly categorized as material. Furthermore, defendants failed to correct these statements. "When a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it

15

complete and accurate." Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26 (1st Cir. 1987). Thus, the Bureau properly showed that defendants violated N.J.S.A. 49:3-52(b) as a matter of law.

V.

Defendants contend that they are not liable because they acted neither recklessly nor intentionally. The Bureau Chief concluded that making misrepresentations or material omissions of fact is a strict liability violation, N.J.S.A. 49:3-52. He wrote that it is not necessary to show that "defendants intended to deceive the investor, [but] only that [they] misrepresented or omitted a material fact in connection with a securities transaction."

When engaging in statutory construction, "our overriding goal must be to determine the Legislature's intent." Hubbard v. Reed, 168 N.J. 387, 392 (2001) (internal citation omitted). The initial step is to look to the statute's plain language. Ibid. If the language is clear on its face, then a court should enforce the statute according to its terms. Ibid. But, "when a 'literal interpretation of individual statutory terms or provisions' would lead to results 'inconsistent with the overall purpose of the statute,' that interpretation should be rejected." Id. at 392-93 (quoting Cornblatt v. Barow, 153 N.J. 218, 242 (1998)).

A-3316-17T3

Here, N.J.S.A. 49:3-52(b) is devoid of any language requiring intent or a culpable state of mind. N.J.S.A. 49:3-52(b) prohibits an issuer from making "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading[.]" The statute mandates neither knowledge nor intent. Moreover, "[w]hen 'the Legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded.'" In re Plan for the Abolition of the Council on Affordable Hous., 214 N.J. 444, 470 (2013) (quoting Higgins v. Pascack Valley Hosp., 158 N.J. 404, 419 (1999)). For instance, the civil liabilities section for private actions in the Securities Law, N.J.S.A. 49:3-71, explicitly requires proof of fraudulent intent in an action for deceit. But the same is not true of the section at issue here.

In Aaron v. SEC, the United States Supreme Court considered whether scienter was necessary under Section 17(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77q(a). 446 U.S. 680, 686 (1980). That section provides that it is unlawful for any person offering or selling any securities:

> (1) [T]o employ any device, scheme, or artifice to defraud, or

(2)  to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3)  to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

[15 U.S.C. § 77q(a).]

The Court in Aaron explained that,

the language of § 17(a)(2), which prohibits any person from obtaining money or property "by means of any untrue statement of a material fact or any omission to state a material fact," is devoid of any suggestion whatsoever of a scienter requirement.  As a well-known commentator has noted, "[t]here is nothing on the face of Clause (2) itself which smacks of scienter or intent to defraud."  In fact, this Court in [Ernst & Ernst v. Hochfelder], pointed out that the similar language of Rule 10b-5(b) "could be read as proscribing . . . any type of material misstatement or omission . . . that has the effect of defrauding investors, whether the wrongdoing was intentional or not."

[446 U.S. at 696 (first, third, and fourth alterations in original) (internal citations omitted).]

Thus, the Court concluded that Section 17(a)(2), 15 U.S.C. § 77q(a) does not require proof of scienter.  Id. at 697.

The elements of a claim under Rule 10b-5, 17 C.F.R. § 240.10b-5, include:

(1) "a misstatement or omission made by the defendant in connection with the

18

purchase or sale of a security"; (2) "regarding a material fact"; (3) "where the defendant had scienter to deceive, manipulate, or defraud"; and (4) "where there is reliance by the plaintiff." Commodity Futures Trading Comm'n v. Am. Metals Exch. Corp., 775 F. Supp. 767, 783 (D.N.J. 1991), aff'd in part, vacated in part, 991 F.2d 71 (3d Cir. 1993). But enforcement proceedings under Rule 10b-5 are brought to "protect the public interest, not to redress private wrongs," so the reliance prong is unnecessary. Id. at 784.

Critically, Rule 10b-5 was promulgated under Section 10(b) of the Securities Exchange Act of 1934 (the 1934 Act), 15 U.S.C. § 78a to 78qq, and reflects the requirements of its authorizing statute. The 1934 Act contains fraud language that is different from that of Section 17(a) or N.J.S.A. 49:3-52. Section 10(b) makes it unlawful for any person

> [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
>
> [15 U.S.C. § 78j(b).]

The Supreme Court explained that, "[t]he words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was

intended to proscribe knowing or intentional misconduct." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197 (1976). Scienter is required under Rule 10(b) because the source statute requires intent – but this is not comparable to N.J.S.A. 49:3-52.

Here, the Final Decision properly modified the portion of the Initial Decision that suggested reckless or willful intent was a necessary element of proving N.J.S.A. 49:3-52(b) violation. As the Bureau Chief explained, "this modification does not impact or alter the ALJ's conclusion that [defendants] violated N.J.S.A. 49:3-52(b), which was analyzed using a higher standard than required." We look to the statute's text to discern the Legislature's intent and conclude that the inclusion of the words "knew" and "intended" in N.J.S.A. 49:3-71, but not in N.J.S.A. 79:3-52(b), indicates that Bureau enforcement actions are not meant to require proof of intent. The text is clear, but even if it was not, there is no extrinsic evidence, such as Senate or Assembly Statements that clarify the intent behind this provision, so it is improper to read mens rea into the statute.

## VI.

Finally, defendants maintain that the sanctions are disproportionate to the offense. The Bureau Chief determines penalty amounts for violations of the

20

Securities Law. See N.J.S.A. 49:3-70.1. "If the Appellate Division is satisfied after its review that the evidence and the inferences to be drawn therefrom support the agency head's decision, then it must affirm even if the court feels that it would have reached a different result itself." Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 587 (2001) (quoting Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588 (1988)). The decision is sustained unless it is arbitrary, capricious, or unreasonable, or lacks fair support in the record. Herrmann, 192 N.J. at 27-28. "That deferential standard applies to the review of disciplinary sanctions as well." Id. at 28. We review if sanctions are "so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness." In re Polk, 90 N.J. 550, 578 (1982) (internal citation omitted). "The threshold of 'shocking' the court's sense of fairness is a difficult one, not met whenever the court would have reached a different result." Herrmann, 192 N.J. at 29.

In the Final Decision, the Bureau Chief assessed penalties totaling $1,125,000, and wrote that,

> [i]n light of the number of violations, the duration of the unlawful conduct, the number of impacted investors, the amount of money raised by the illegal sale of the securities, and the egregiousness of [defendants'] conduct, it is in the public interest to affirm the civil penalties ordered in the Summary Order.

First, defendants sold EES Securities to 225 investors in violation of N.J.S.A. 49:3-60. Second, they employed unregistered agents in violation of N.J.S.A. 49:3-56(h). Third, Burlum acted as an unregistered agent in violation of N.J.S.A. 49:3-56(a). Fourth, defendants violated N.J.S.A. 49:3-52(b) by making material misstatements. Finally, defendants disregarded the Bureau Chief's instructions to cease offering and selling securities while the Bureau was investigating. Given our deferential standard of review, the Bureau Chief's sanctions were not disproportionate to defendants' offenses as to be "shocking to one's sense of fairness," Polk, 90 N.J. at 578 (internal citation omitted), and thus were neither arbitrary, capricious, nor unreasonable. Herrmann, 192 N.J. at 27-28.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION